INDUSTRIAL RISK INSURERS and Quad Graphics, Inc.,
Plaintiffs-Respondents-Cross-Appellants,

v.

AMERICAN ENGINEERING TESTING, INC.,
Denzin Engineering, LLC, HK Systems, Inc.,
Rack Structures, Inc., Federal Insurance
Company, American Home Assurance Company,
OneBeacon Insurance Co., St. Paul Fire &
Marine Ins. Co., Commercial Union Midwest
Insurance Company and St. Paul Surplus Lines
Insurance Company, Defendants,

Nicole L. JACKSON, Raul Garza, Loren L. Swoboda,
State Farm Insurance Companies, Rural Mutual
Insurance Co., Progressive Insurance Companies,
Richard R. Kottnitz and Denise Padilla,
Intervenors,

LUMBERMENS MUTUAL CASUALTY CO.
and Leavitt Tubing Company, LLC,
Defendants-Appellants-Cross-Respondents.†

Court of Appeals

*No. 2008AP484. Oral argument January 6, 2009.
—Decided April 14, 2009.*

2009 WI App 62

(Also reported in 769 N.W.2d 82.)

† Petition to review denied 7/16/09.

On behalf of the defendants-appellants-cross-respondents Lumbermens Mutual Casualty Company and Leavitt Tubing Company, LLC, the cause was submitted on the briefs of *John V. McCoy* and *Thomas C. Hofbauer* of *McCoy & Hofbauer,* of Waukesha, with oral argument by Thomas C. Hofbauer.

On behalf of the defendant-appellant-cross-respondent St. Paul Surplus Lines Insurance Company, the cause was submitted on the briefs of *Brady C. Williamson, Katherine Stadler* and *Bryan J. Cahill* of *Godfrey & Kahn, S.C.*, of Madison, and *Jean M. Golden, Pro Hac Vici,* of *Cassiday, Schade LLP,* of Chicago, Illinois, with oral argument by Brady C. Williamson.

On behalf of the plaintiffs-respondents-cross-appellants Industrial Risk Insurers and Quad Graphics, Inc., the cause was submitted on the briefs of *Jeffrey R. Zehe* and *Patrick C. Hess* of *Nielsen, Zehe & Antas, P.C.,* of Chicago, Illinois, and *Bruce A. Schultz* and *Karen M. Gallagher* of *Coyne, Schultz, Becker & Bauer, S.C.,* of Madison, with oral argument by Patrick C. Hess.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J. Leavitt Tubing Company, LLC (Leavitt) and Lumbermens Mutual Casualty Company (Lumbermens) appeal from a final judgment entered in favor of Industrial Risk Insurers (IRI) and Quad Graphics, Inc. (Quad).[1] IRI/Quad cross-appeals, contending that the trial court erred by refusing to award it interest and double costs against Lumbermens under the offer-of-settlement provisions found in WIS. STAT. § 807.01 (2007–08).[2]

¶ 2. Leavitt contends: (1) joint and several liability does not apply to it; (2) the economic loss

---

[1] We refer to IRI and Quad collectively as IRI/Quad and use a singular pronoun except when it is necessary to refer to them separately. Similarly, we refer to Leavitt and Lumbermens collectively as Leavitt except when it is necessary to refer to them separately.

[2] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

doctrine precludes IRI/Quad's strict product liability claim; (3) the special verdict did not comply with Wisconsin law; and (4) the trial court erred when it admitted evidence of eddy current testing related to Leavitt's manufacturing process and when it did not allow Leavitt to cross-examine an HK employee regarding a host of issues that it contends were "critical to establishing Quad's contributory negligence." We conclude: Leavitt is jointly and severally liable for IRI/Quad's damages; the damage to adjacent buildings on Quad's property constituted damage to "other property" such that the economic loss doctrine does not bar IRI/Quad's strict liability claim; the form of the special verdict was proper despite Leavitt's contention that it did not address Leavitt's steel tubing as a component part of the AS/RS; Leavitt waived its remaining objections to the form of the special verdict by not placing those objections on the record; and the trial court's rulings on the evidentiary issues Leavitt raises were proper.[3]

¶ 3. In its cross-appeal, IRI/Quad contends that it is entitled to interest and double costs from Lumber mens under Wis. Stat. § 807.01. We agree based on our

---

[3] In using the term "waiver," we are aware of the recently decided case of *State v. Ndina*, 2009 WI 21, 315 Wis. 2d 653, 761 N.W.2d 612, where our supreme court clarified the distinction between the terms "forfeiture" and "waiver." *See id.*, ¶ 29 ("Although cases sometimes use the words 'forfeiture' and 'waiver' interchangeably, the two words embody very different legal concepts. 'Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.' ") (citation omitted). Although forfeiture is applicable in this context, we use waiver to be consistent with Wis. Stat. § 805.13(3) and the cases cited. *See infra* ¶¶ 45–48.

conclusion that IRI/Quad's settlement offer was valid. Consequently, we affirm on the appeal and reverse on the cross-appeal.

## I. BACKGROUND.

¶ 4. This matter arises from the collapse of and resulting fire at a warehouse structure owned by Quad. Quad entered into a Design-Install Agreement (the Agreement) with HK, pursuant to which HK was to design and supervise the construction of an AS/RS to be located in Lomira, Wisconsin. HK subcontracted with Rack Structures, Inc. (RSI) for the design and installation of the rack structure. Leavitt manufactured the steel tubes RSI used to make the columns of the AS/RS rack structure.

¶ 5. The AS/RS consisted of a rack structure that was more than one hundred feet tall, ninety feet wide, and two football fields long. It was equipped with computer-controlled cranes designed to automatically transport, lift, store, and retrieve millions of pounds of paper. The AS/RS collapsed on July 12, 2002, at which time it had been in operation for approximately two months and was holding less than half of its intended load capacity. Inspection was ongoing at the time of the collapse, and Quad had not yet released approximately $400,000 in withheld progress payments to HK. The progress payments were to be made upon substantial completion of the project.

¶ 6. Due to the collapse and resulting fire, Quad initially alleged approximately $65,000,000 in damages of which its insurer, IRI, paid $59,000,000. Quad and IRI, as Quad's subrogated insurer, filed suit against the

contractors and subcontractors who worked on the warehouse structure, along with their insurers.[4]

¶ 7. HK was afforded liability coverage for the project from a number of insurers: HK had both a primary commercial general liability (CGL) policy and a primary professional errors and omissions policy with Admiral Insurance Company (Admiral), each with limits of $1,000,000; a Westchester Surplus Lines (Westchester) policy provided umbrella coverage with a $10,000,000 limit; St. Paul Surplus Lines Insurance Company (St. Paul) afforded second layer excess coverage to HK through its policy, which had a $15,000,000 limit; and Federal Insurance Company (Federal) provided $10,000,000 in coverage excess to that provided by St. Paul. Prior to trial, IRI/Quad, HK, and various HK insurers entered into what was titled a "Special '*Loy*' Agreement and Covenant Not to Sue."[5] (Some uppercasing omitted; bolding and italics added.) Also released were two insurers providing coverage to HK as an "additional insured" pursuant to policies issued to RSI.

¶ 8. Leavitt and its primary insurer also entered into a settlement agreement with IRI/Quad. The agreement reserved IRI/Quad's right to pursue Lumbermens, Leavitt's excess insurer, for Leavitt's liability to the extent coverage was afforded under its policy with Lumbermens. Lumbermens' policy limit was $20,000,000.

¶ 9. The trial was handled in two phases. In the first phase, the jury heard IRI/Quad's strict product liability claim against HK, RSI, and Leavitt, with IRI/Quad asserting that the AS/RS was a defective

[4] Quad and IRI's action was filed in Dodge County. HK filed a complaint seeking a declaratory judgment and asserting a breach of contract claim against Quad in Milwaukee County, and the two cases were consolidated in Milwaukee County.

[5] *See Loy v. Bunderson*, 107 Wis. 2d 400, 320 N.W.2d 175 (1982).

product. The jury found HK (51%), RSI (39%), and Leavitt (10%) liable for the collapse and further concluded that Quad was not negligent. Damages were not contested and the trial court inserted the amount of $63,335,819 on the special verdict form.

¶ 10. During the second phase which was tried to the court, the trial court heard IRI/Quad's claim that HK breached the Agreement. In addition to concluding that HK breached the Agreement, the trial court rejected arguments advanced by St. Paul regarding its coverage obligations and whether IRI was precluded from recovering from HK based on St. Paul's contention that IRI was required to insure HK pursuant to the terms of the Agreement.

¶ 11. The trial court also heard postverdict motions addressing whether HK would be included on the judgment that was to be entered and the availability of interest and double costs to IRI/Quad based on its settlement offers made before trial. After concluding that HK would not be included on the judgment and that IRI/Quad was not entitled to interest and double costs pursuant to Wis. Stat. § 807.01, judgment was entered against both St. Paul and Lumbermens for their policy limits, in addition to costs and disbursements. Additional facts are provided in the remainder of this opinion as needed.

## II. Analysis.

### A. *Leavitt's Appeal.*

#### 1. Is Leavitt jointly and severally liable for IRI/Quad's damages?

¶ 12. As noted, the jury allocated liability on IRI/Quad's product liability claim as follows: HK was

51% liable; RSI was 39% liable; and Leavitt was 10% liable for IRI/Quad's damages, which totaled more than $63,000,000. Quad was not found negligent. The trial court concluded that joint and several liability applies and entered judgment against Lumbermens, Leavitt's excess insurer, in the amount of $20,912,741.76.

¶ 13. Leavitt contends that joint and several liability does not apply to it. To support its position, Leavitt makes four arguments. First, it asserts that because IRI/Quad entered into a *Pierringer* agreement with both HK and RSI, IRI/Quad cannot recover RSI's portion of liability for the damages from Leavitt.[6] Second, that once IRI/Quad entered into a *Pierringer* agreement with any joint tortfeasor, it was precluded from seeking more than the jury's apportionment of liability from a nonsettling tortfeasor due to the fact that it agreed to indemnify the settling tortfeasor for any contribution action. Third, that in IRI/Quad's agreement with HK, IRI/Quad agreed to indemnify HK. Therefore, because the trial court determined HK was 100% responsible for IRI/Quad's damages pursuant to the breach of contract claim and IRI/Quad agreed to indemnify HK, IRI/Quad should not be allowed to seek more than the jury's apportionment of liability from Leavitt. Fourth, that "based upon the history of joint and several liability in Wisconsin, joint and several liability no longer applies to all tortfeasors involved in strict product liability claims."

■■
¶ 14. Leavitt's arguments require that we construe the settlement agreement, titled a "Special '*Loy*' Agreement and Covenant Not to Sue," which IRI/Quad entered into with HK. (Some uppercasing omitted;

---

[6] *See Pierringer v. Hoger*, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

bolding and italics added.) "Releases should be construed to give effect to the intention of the parties. The parties' intent, though, must be sought from the whole and every part of the instrument and from the surrounding conditions and circumstances." *Brandner v. Allstate Ins. Co.*, 181 Wis. 2d 1058, 1078, 512 N.W.2d 753 (1994) (citations and one set of internal quotation marks omitted). In our review, we defer to the trial court's determination of the intent of the parties to a release as it involves a question of fact. *Id.*

### a. IRI/Quad did not settle with RSI.

¶ 15. Initially, we address Leavitt's contention that IRI/Quad settled with both HK and RSI. In this regard, Leavitt focuses on clause six of the settlement agreement, which reads:

> 6. *Covenant Not to Sue Certain Persons Associated with RSI.*
>
> Quad Graphics, IRI and HK agree to never institute any suit or action at law or in equity arising out of the July 12, 2002, collapse of the AS/RS at the Lomira Facility against any current or former employee, officer, director or shareholder of RSI, although they reserve their rights to pursue all claims and proceed against RSI.

Leavitt surmises, "[i]f RSI was not involved with the settlement agreement, as [IRI/]Quad claims, there would be no reason for the agreement to contain a protective clause for RSI's employees, officers, directors, and shareholders." As further support for its argument, Leavitt emphasizes: IRI/Quad's receipt of $4,000,000 in settlement funds from RSI's insurers; IRI/Quad's agreement to dismiss its claims against RSI's insurers; and IRI/Quad's covenant not to sue RSI's insurers. These terms, according to Leavitt, "demon-

strate that the intent of the parties was to enter into a *Pierringer* settlement agreement with both HK and RSI." (Underlining omitted; bolding and italics added.) We are not convinced.

¶ 16. By focusing on the language stating that Quad, IRI, and HK agreed not to institute any suit or action at law or in equity against RSI's current or former employees, officers, directors, or shareholders, Leavitt disregards Quad, IRI, and HK's express reservation in that same clause of "their rights to pursue all claims and proceed against RSI." In addition, prior to clause six, the settlement agreement again expressly provides for a reservation of IRI/Quad's rights to pursue claims against RSI:

> WHEREAS, Quad Graphics and IRI desire and intend to reserve all other claims arising from the July 12, 2002, collapse of the AS/RS at the Lomira Facility, including without limitation, all of their claims against HK that are covered by the St. Paul Policy, by "other insurance" as that term is defined in the St. Paul Policy and by the Federal Policy, *and all of their claims against RSI,* St. Paul and Federal.

(Emphasis added.)

¶ 17. In addressing whether the settlement agreement released RSI, the trial court held:

> I note that the *Loy* Agreement included a clause which was an agreement on the part of the plaintiffs not to sue RSI's officers or directors. And the argument that's been advanced, as I understand it, is that the clause renders the *Loy* Agreement into some sort of a *Pierringer* release so that the plaintiffs have to bear the brunt of the allocation that was given to RSI.
>
> I read over the language with respect to the officers and the directors, but the bottom line is that the party to the action was RSI, and RSI was not released.

From what has been said I understand that, in the submissions, RSI's insurer contributed to the settlement. In that sense the *Loy* Agreement benefited defendants as well as plaintiffs because it brought about efficiently an end to that component of the litigation and the amount that was recovered from the RSI insurers reduces the overall exposure since there can be no double recovery allowed.

So the bottom line is that RSI was not released and, and that does have negative repercussions with respect to the issue of joint and several liability.

(Bolding and italics added.) We agree with the trial court's reasoning.

■■

¶ 18. IRI/Quad's settlement agreement was with HK, HK's insurers, and RSI's insurers (HK was named as an additional insured under the policies issued by RSI's insurers), not RSI. That RSI's insurers paid $4,000,000 on behalf of their additional insured, HK, in exchange for dismissal and a covenant not to sue from IRI/Quad did not result in a release of RSI.

### b. IRI/Quad entered into a *Loy* release with HK.

¶ 19. Next, a determination of the nature of the settlement agreement is pivotal to our resolution of this appeal. Leavitt contends that its liability is limited to the percentage allocated by the jury because IRI/Quad entered into a *Pierringer* agreement with HK. IRI/Quad asserts that it entered into a *Loy* release with HK.[7]

---

[7] As Leavitt points out, in a letter to the trial court, IRI/Quad wrote:

**[4–9]**

¶ 20. As explained by the supreme court in *Van-Cleve v. City of Marinette*, 2003 WI 2, ¶ 39, 258 Wis. 2d 80, 655 N.W.2d 113: "[A] *Pierringer* release operates to impute to the settling plaintiff whatever liability in contribution the settling defendant may have to non-settling defendants and to bar subsequent contribution actions the non-settling defendants might assert against the settling defendants." (Citing *Pierringer v. Hoger*, 21 Wis. 2d 182, 193, 124 N.W.2d 106 (1963).) In contrast, "the *Loy* court characterized the agreement in that case as essentially a 'covenant not to sue,' rather than a true release of a portion of the plaintiff's cause of action, as occurred in *Pierringer.*" *Brandner*, 181 Wis. 2d at 1075 (citation omitted). As further distinguished from a *Pierringer* release, "a covenant not to sue preserves the plaintiff's entire cause of action against the non-settling joint tortfeasor, including that portion attributable to the settling tortfeasor's negligence. As a result, a covenant not to sue does not extinguish a non-settling joint tortfeasor's contribution rights, while a *Pierringer* release does." *Id.*

> Plaintiffs' partial settlement agreements with HK and Leavitt are *Pierringer*-type agreements because plaintiffs agreed to indemnify HK and Leavitt for claims against them, including contribution claims, for which they have no insurance. The indemnification clauses in those agreements have the effect of imputing to plaintiffs any of HK's and Leavitt's uninsured liability.

(Bolding added; citations omitted.) We are perplexed that IRI/Quad made this representation to the trial court when the settlement agreement itself and the proceedings leading to these appeals reflect that the settlement agreement was, in fact, a *Loy* release. We presume IRI/Quad's attorney made this statement in error.

██

¶ 21. IRI/Quad highlights the partial nature of the release as evidenced by the following language:

> This Partial Release hereby credits and satisfies that portion of the total amount of damages to Quad Graphics and IRI that has been caused by HK to the extent of $15 million and specifically reserves all claims against HK to the extent and only to the extent that HK has coverage under the St. Paul Policy, "other insurance" as that term is defined in the St. Paul Policy and the Federal Policy. In other words, this is not a *Pierringer*-type release. Instead, this is a *Loy*-type release recognized in *Loy v. Bunderson*, 107 Wis. 2d 400, 320 N.W.2d 175 (1982).

(Some bolding and italics added.) We agree with IRI/Quad that the effect of this language, which "[f]rom HK's perspective, . . . removed the specter of it owing damages in excess of insurance coverage[,] . . . . is precisely the form and function of a *Loy*-type release." In ruling on the issue, the trial court stated: "The *Loy* Agreement makes clear that the release of claims was partial . . . . It is plain that HK did not obtain a complete release and that the agreement is not a *Pierringer*." Again, we agree.

¶ 22. Leavitt asserts that the application of joint and several liability to it, requiring it to pay any amount above 10%, would be "unfair" and would require it to sue HK for the "unfair amounts" in a separate contribution action. Leavitt contends that "Quad's settlement agreement with HK, however, essentially prevents Leavitt's ability to sue for contribution, as [IRI/]Quad agreed to indemnify HK for such a contribution claim."

¶ 23. This argument is not compelling. From Leavitt, IRI/Quad is seeking a portion of *RSI's liability*

for the damages, *not HK's*. IRI/Quad acknowledges that HK is also jointly and severally liable for RSI's portion of the verdict. There is no obligation on IRI/Quad's part to indemnify RSI because IRI/Quad did not settle with RSI or agree to indemnify RSI for its percentage of fault. Leavitt continues to have contribution rights against RSI. Thus, Leavitt's concern related to having to recover its "unfair share" from IRI/Quad is unfounded.

### c. HK's breach of the contract does not relieve Leavitt of its joint and several liability for IRI/Quad's damages.

¶ 24. Leavitt's next argument centers on the trial court's determination that HK breached its contract with Quad. As a result of the breach, Leavitt submits that HK is responsible for 100% of IRI/Quad's damages. Leavitt continues by arguing that due to IRI/Quad's agreement with HK, pursuant to which IRI/Quad agreed to indemnify HK for its liability, "[IRI/]Quad cannot now seek more than the jury's allocation from Leavitt because [IRI/]Quad has agreed to indemnify HK, a party that was entirely responsible for all of [IRI/]Quad's damages."

¶ 25. We agree with IRI/Quad that "without any cite to supporting case law, it appears Leavitt is trying to shoehorn HK's obligation to pay contractual damages into an amount Leavitt is responsible for under tort law." Arguments unsupported by legal authority will not be considered, *see Kruczek v. DWD*, 2005 WI App 12, ¶ 32, 278 Wis. 2d 563, 692 N.W.2d 286, and we will not abandon our neutrality to develop arguments, *see M.C.I., Inc. v. Elbin*, 146 Wis. 2d 239, 244–45, 430 N.W.2d 366 (Ct. App. 1988).

### d. Joint and several liability continues to apply to tortfeasors in strict product liability claims.

¶ 26. · Lastly, we address Leavitt's contention that joint and several liability no longer applies to all tortfeasors involved in strict product liability claims. According to Leavitt, the policy reasons for the 1995 amendment to WIS. STAT. § 895.045, which changed the common law on joint and several liability, support its application to strict product liability claims. *See generally Thomas v. Bickler*, 2002 WI App 268, ¶ 14, 258 Wis. 2d 304, 654 N.W.2d 248 ("The 1995 amendment to WIS. STAT. § 895.045 . . . modified the common-law doctrine of joint and several liability. Under WIS. STAT. § 895.045(1), a joint tortfeasor cannot be jointly and severally liable unless he or she is found to be 51% or more causally negligent."). Leavitt's position is at odds with Wisconsin case law on this point.

¶ 27. In *Fuchsgruber v. Custom Accessories, Inc.*, 2001 WI 81, ¶ 1, 244 Wis. 2d 758, 628 N.W.2d 833, our supreme court squarely addressed "whether the 1995 amendment to the comparative negligence statute, WIS. STAT. § 895.045(1) applies to strict product liability actions." (Parenthetical for version of the statutes cited and correlating footnote omitted.) The court conclusively determined: "The answer is no." *Fuchsgruber*, 244 Wis. 2d 758, ¶ 1. In reference to the amended version of § 895.045, *Fuchsgruber* made clear: "The new statute does not . . . explicitly or even implicitly suggest a legislative purpose to change the common law of strict product liability." *Id.*, 244 Wis. 2d 758, ¶ 26; *see also id.*, ¶ 29 ("While the 1995 amendment clearly ushered in a significant development in negligence law, there is nothing in the language of the new statute that

even hints at a legislative purpose to accomplish such a sweeping change in the common law of strict product liability in this state.").

██

¶ 28. Despite the clarity with which *Fuchsgruber* articulates the absence of any support for modifying the common law of strict product liability, *see id.*, Leavitt argues the policy reasons for the 1995 amendment to WIS. STAT. § 895.045 support its application to strict product liability claims. We are not convinced. Although Leavitt urges that it should only be obligated to pay for the portion of damages attributed to it by the jury, i.e., 10%, this court does not have the authority to modify binding precedent, which in this instance, mandates the application of joint and several liability in strict product liability claims. *See, e.g., Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997) ("[O]nly the supreme court, the highest court in the state, has the power to overrule, modify or withdraw language from a published opinion of the court of appeals.").

### 2. Does the economic loss doctrine preclude IRI/Quad's strict product liability claim?

██

¶ 29. Leavitt contends that the economic loss doctrine precludes IRI/Quad's strict product liability claim. We review *de novo* the economic loss doctrine's applicability to a claim under a given set of facts. *Below v. Norton*, 2008 WI 77, ¶ 19, 310 Wis. 2d 713, 751 N.W.2d 351.

██

¶ 30. "The economic loss doctrine is a judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under

172

the tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400, 573 N.W.2d 842 (1998). If, however tort claims are based on damage to "other property" or a combination of economic loss and damage to "other property," the economic loss doctrine is not a bar. *See Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 247, 593 N.W.2d 445 (1999) ("The economic loss doctrine does not preclude a product purchaser's claims of personal injury or damage *to property other than the product itself.* Similarly, claims which allege economic loss in combination with non-economic loss are not barred by the doctrine.") (emphasis added; citations omitted).

¶ 31. To determine whether IRI/Quad sustained purely economic loss, as opposed to a combination of economic loss and "other property" loss, we look to the integrated system and disappointed expectations tests. *See Foremost Farms USA Co-op. v. Performance Process, Inc.*, 2006 WI App 246, ¶ 14, 297 Wis. 2d 724, 726 N.W.2d 289 ("At least two tests are used to determine whether damaged property is 'other property' in a legal sense: the integrated system test and the disappointed expectations test.") (two sets of internal quotation marks omitted). We address both below.

### a. The integrated system test.

 ██

¶ 32. Leavitt asserts that all of IRI/Quad's damages involved damage to an integrated system. Under the integrated system test, " '[d]amage by a defective component of an integrated system to either the system as a whole or other system components is not damage to "other property" which precludes the application of the

economic loss doctrine.'" *Grams v. Milk Prods., Inc.*, 2005 WI 112, ¶ 28, 283 Wis. 2d 511, 699 N.W.2d 167 (citation omitted).

¶ 33. IRI/Quad's damages can be grouped into three categories: (1) damage to the AS/RS itself; (2) destruction of the printed materials stored in the AS/RS;[8] and (3) damage to adjacent buildings, which had to be repaired and cleaned following the collapse.[9] IRI/Quad concedes the destruction of the AS/RS constitutes economic loss under the integrated system test. Therefore, we focus on the second and third categories of damages.

■

¶ 34. With respect to the destruction of the printed materials in the AS/RS at the time of the collapse, Leavitt argues that this constitutes damage to an integrated system. Even if we accept Leavitt's position in this regard, we nevertheless conclude that the damage to the adjacent buildings amounted to damage to "other property," which precludes the economic loss doctrine's application.

¶ 35. Leavitt attempts to minimize the damage to adjacent buildings by referencing it as "damages stemming from debris removal, clean up, and repair costs." According to Leavitt, these were "consequential losses" to which the economic loss doctrine applies. As support for this proposition, Leavitt cites *Daanen & Janssen, Inc.*, where our supreme court explained: "[Economic

---

[8] At the time of the collapse, the AS/RS contained more than 25,000 pallets of magazines, catalogs, and newspaper inserts in various stages of production, all of which were destroyed in the collapse and subsequent fire. The cost to replace these materials was $27,300,293.

[9] Costs related to this category of damages were $1,482,198.

loss] includes both direct economic loss and consequential economic loss . . . . 'Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.' " *Id.*, 216 Wis. 2d at 401 (citation omitted).

¶ 36. We are not persuaded that the broad notion of *consequential losses* Leavitt relies upon has the same meaning as *the consequential economic losses* contemplated in the case law. If this were the case, the decision in *Daanen & Janssen, Inc.* would have had the effect of essentially nullifying the "other property" exception to the economic loss doctrine insofar as it is difficult to come up with a scenario where "other property" damage would not also qualify as an "indirect loss." That it did not intend to have this effect is evident in the *Daanen & Janssen, Inc.* court's subsequent reiteration: "The economic loss doctrine . . . does not bar a commercial purchaser's claims based on personal injury or damage to property other than the product, or economic loss claims that are alleged in combination with noneconomic losses." *Id.* at 402.

■■

¶ 37. Similarly, we are not persuaded by Leavitt's assertion that "the AS/RS itself was a component part of Quad's commercial printing facility in Lomira, which totaled fifteen buildings and encompassed over 2 million square feet of property." Leavitt's expansive assessment that "the AS/RS was simply an addition to another 'integrated system,' which was Quad's printing facility," loses sight of the fact that "[r]ecovery for economic loss necessarily focuses on the bargain struck between the parties." *See Northridge Co. v. W.R. Grace and Co.*, 162 Wis. 2d 918, 933, 471 N.W.2d 179 (1991). Here, the parties bargained for an AS/RS, not for the entirety of Quad's commercial printing facility. Again, if the law

supported Leavitt's interpretation of what constitutes a component part for purposes of the integrated system test, the "other property" exception to the economic loss doctrine would, in all likelihood, cease to exist, as an argument could surely be made that just about any product is "simply an addition to another integrated system."

¶ 38. The court in *Wausau Tile, Inc.* detailed, in general terms, a scenario that makes clear the damage to adjacent buildings which Quad incurred constitutes "other property" damage for purposes of the integrated system test. " 'A product that nondangerously fails to function due to a product defect has clearly caused harm only to itself. A product that fails to function and causes harm to surrounding property has clearly caused harm to other property.' " *Id.*, 226 Wis. 2d at 249 (quoting RESTATEMENT (THIRD) OF TORTS § 21 cmt. e (1997)). The latter is the exact situation that presents itself to us.

¶ 39. Having concluded that the damage to adjacent buildings on Quad's property constitutes "other property" damage for purposes of the integrated system test, we now turn to the disappointed expectations test. *See Foremost Farms*, 297 Wis. 2d 724, ¶ 16 ("[I]f the damaged property appears to be 'other property' under the integrated system test, then the disappointed expectations test is applied.") (two sets of internal quotation marks omitted).

### b. The disappointed expectations test.

¶ 40. Wisconsin courts have adopted the disappointed expectations test in recognition that the integrated system test is not easily applied "to all situations

involving property damage to which the economic loss doctrine logically applies." *Grams*, 283 Wis. 2d 511, ¶ 31. "This concept governs situations in which a commercial product causes property damage but the damage was within the scope of bargaining, or . . . 'the occurrence of such damage could have been the subject of negotiations between the parties.' " *Id.* (citation omitted). The "test is directed at determining whether the purchaser should have anticipated the need to seek protection against loss through contract. [It] focuses on the expected function of the product and whether, from the purchaser's perspective, it was reasonably foreseeable that the product could cause the damage at issue." *Foremost Farms*, 297 Wis. 2d 724, ¶ 17. Thus, the key question turns on an objective standard: "Should a reasonable purchaser in the plaintiff's position have foreseen the risk?" *Id.*, ¶ 19.

■

¶ 41. According to Leavitt, the possibility that the AS/RS might fail was a subject of negotiations; therefore, all of the ensuing damages were a result of disappointed expectations. IRI/Quad concedes: "It was reasonably foreseeable that the AS/RS might not shuttle paper pallets back and forth as quickly or accurately as Quad expected[, and i]t was reasonably foreseeable that the AS/RS might require more maintenance and repair than Quad expected." Despite these concessions, however, IRI/Quad asserts, "the risk of the AS/RS imploding in a conflagration of catastrophic proportions, destroying the AS/RS, destroying its contents and damaging adjacent buildings—all within the first three months of use—was entirely unanticipated." We agree.

¶ 42. In *Selzer v. Brunsell Bros.*, 2002 WI App 232, ¶¶ 5–6, 8, 257 Wis. 2d 809, 652 N.W.2d 806, a

homeowner filed suit against a window manufacturer after windows he purchased sustained wood rot damage that spread to the siding below the windows. The *Selzer* court concluded the homeowner was barred by the economic loss doctrine from recovering in tort because the homeowner's claims "stem[med] directly from the failure of the windows to perform as expected." *Id.*, ¶¶ 34, 37. The court then went on to clarify its holding:

> Because [the homeowner] has not proved any harm beyond disappointed expectations, he is precluded from pursuing a recovery in tort. Had the windows resisted rot but spontaneously shattered, spewing shards of glass into an adjacent Picasso, [the homeowner] might well argue that the defective windows damaged his painting in an entirely unanticipated manner, going well beyond a failure to perform as expected and entitling him to pursue a tort remedy.

*Id.*, ¶ 37.

¶ 43. The damage to the adjacent buildings resulting from the collapse of the AS/RS was akin to the example of spontaneously shattering windows in *Selzer*. Consequently, we conclude that the economic loss doctrine does not bar IRI/Quad's strict liability claim.

### 3. Did the special verdict comply with Wisconsin law?

¶ 44. According to Leavitt, the special verdict failed to properly address Leavitt's steel tubing as a component part of the AS/RS and also failed to allow the jury to address the AS/RS and the steel tubing separately.[10] Leavitt further contends that the trial court erred when it included a "responsible for a defect"

---

[10] The special verdict read, in relevant part, as follows:

Question 1:

When the steel tubing left the possession of Leavitt Tube Company was the steel tubing in a defective condition so as to be unreasonably dangerous to a prospective user?

Answer: <u>Yes</u>

*If you answered Question 1 "yes," answer the following question, otherwise do not answer it.*

Question 2:

Was the defective condition of the steel tubing a cause of the collapse of the automated storage retrieval system (AS/RS)?

Answer: <u>Yes</u>

Question 3:

Was HK Systems, Inc. responsible for a defect in the automated storage and retrieval system (AS/RS) that made the AS/RS unreasonably dangerous to a prospective user?

Answer: <u>Yes</u>

*If you answered Question 3 "yes," answer the following question, otherwise do not answer it.*

Question 4:

Was such defect a cause of the collapse of the automated storage retrieval system (AS/RS)?

Answer: <u>Yes</u>

Question 5:

Was Rack Structures, Inc. (RSI) responsible for a defect in the automated storage and retrieval system (AS/RS) that made the AS/RS unreasonably dangerous to a prospective user?

Answer: <u>Yes</u>

*If you answered Question 5 "yes," answer the following question, otherwise do not answer it.*

Question 6:

Was such defect a cause of the collapse of the automated storage retrieval system (AS/RS)?

Answer: <u>Yes</u>

179

were not in the proper order because the form asked the jury to answer the question relating to Quad's contributory negligence after the question relating to the defendants' conduct.

¶ 45. IRI/Quad argues that Leavitt waived its objections related to the "responsible for a defect" phrase and the order of the questions within the verdict

. . . .

*If you answered "yes" to **two or more** of the causal fault questions (Questions 2, 4, 6, 8), then answer the following question; otherwise do not answer it . . . .*

Question 9:

Assuming the total conduct of the parties to which you answered "yes" to be 100%, what percentage do you attribute to:

| | |
|---|---|
| a-Leavitt Tube Company | 10% |
| b-HK Systems, Inc. | 51% |
| c-Rack Structures, Inc. (RSI) | 39% |
| d-Graef Anhalt, Schloemer & Associates, Inc. (GAS) | 0% |
| Total | 100% |

*If you have answered "yes" to Question 2, or Question 4, or Question 6 **or** Question 8, answer the following question, otherwise do not answer it.*

Question 10:

Was the plaintiff, Quad/Graphics, negligent?

Answer: <u>No</u>

(Bolding and italics as they appear in original.) HK hired GAS to design the foundation, siding, and roof of the building which housed the AS/RS structure. In addition, GAS was the "supervising professional" responsible for filing building plans with the Wisconsin Department of Commerce and for confirming the project was ready for use and in substantial compliance with the plans and specifications.

form. Whether a waiver has occurred is a legal question subject to our independent review. *LaCombe v. Aurora Med. Group, Inc.*, 2004 WI App 119, ¶ 5, 274 Wis. 2d 771, 683 N.W.2d 532.

¶ 46. Following an off-the-record verdict and instruction conference, the trial court gave the parties an opportunity to state their objections on the record:

> THE COURT: Good morning, everyone. A few minutes ago I gave you copies of the Special Verdict and of the jury instructions. The record should reflect that last Friday afternoon we went into chambers and went over the structure of the Special Verdict and the jury instructions that were going to be given. There was agreement regarding quite a number of matters, but not quite with respect to everything.
>
> I think one of the areas on which we agreed were the names of the entities that would be included and the agreement was that those would be Leavitt Tube Company, HK Systems, Incorporated, Rack Structures, Incorporated, and GAS.
>
> You've now—there were obviously a number of details to work out even after we had concluded our discussion; and there was also an objection on the part of [counsel for Leavitt], I think, to some part of the instructions.
>
> Was there, [counsel for Leavitt]?
>
> [COUNSEL FOR LEAVITT]: We simply want to preserve the record with respect to the verdict question we submitted that would compare the negligence of Quad/Graphics to the component part. We submitted a trial brief on that issue, and we understand Your Honor's ruling, but we just want to make sure the record is preserved on that issue.

THE COURT: So your position is that the product that Quad/Graphics' negligence should be compared to is the tube, itself.

[COUNSEL FOR LEAVITT]: Correct.

THE COURT: All right. Anything else?

Counsel for Leavitt did not raise any additional issues pertaining to the special verdict or jury instructions.

¶ 47. Leavitt does not dispute that it neglected to state its additional objections on the record; instead, it relies on a pretrial submission it sent to the court addressing the issues it now asserts on appeal. Leavitt's pretrial submission, however, does not save it from Wis. Stat. § 805.13(3)'s mandate: "Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict."[11] *See Gosse v. Navistar Int'l Transp. Corp.*, 2000 WI App 8, ¶ 20, 232 Wis. 2d 163, 605 N.W.2d 896 (disagreeing with appellant who argued that no further objection was necessary

---

[11] Wisconsin Stat. § 805.13(3) reads:

(3) Instruction and verdict conference. At the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury. At the conference, or at such earlier time as the court reasonably directs, counsel may file written motions that the court instruct the jury on the law, and submit verdict questions, as set forth in the motions. The court shall inform counsel on the record of its proposed action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. *Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.*

(Emphasis added.)

when the trial court did not accept the proposed special verdict he submitted); *Frayer v. Lovell*, 190 Wis. 2d 794, 809, 529 N.W.2d 236 (Ct. App. 1995) (finding waiver due to plaintiff's failure to object with particularity on the record to proposed jury instructions even though plaintiff included the instruction at issue in his proposed list of jury instructions submitted to the court).

██

¶ 48. As we recognized in *LaCombe*, "[p]ursuant to Wis. Stat. § 805.13(3), the failure to object at the jury instruction or verdict conferences constitutes a waiver of any error in the proposed instructions or verdict. We have no power to review waived error of this sort." *See LaCombe*, 274 Wis. 2d 771, ¶ 5 (parenthetical designating version of statute, citation, and internal quotation marks omitted); *see generally Steinberg v. Jensen*, 204 Wis. 2d 115, 120–21, 553 N.W.2d 820 (Ct. App. 1996) ("If an attorney disagrees with an instruction that the trial court decides to give during an off-the-record conference, the attorney must place an objection to the instruction on the record in order to preserve the issue for appeal.").

██ ██

¶ 49. Thus, the only issue remaining with respect to the special verdict is Leavitt's contention that the special verdict failed to properly address its steel tubing as a component part of the AS/RS and also failed to allow the jury to address the AS/RS and the steel tubing separately. "A special verdict must cover material issues of ultimate fact. The form of a special verdict is discretionary with the trial court and [an appellate] court will not interfere as long as all material issues of fact are covered by appropriate questions." *Meurer v. ITT Gen. Controls*, 90 Wis. 2d 438, 445–46, 280 N.W.2d 156 (1979); *see also* Wis. Stat. § 805.12.

¶ 50. Leavitt directs us to the RESTATEMENT (THIRD) OF TORTS § 5 (1998), which addresses the liability of commercial sellers of product components for harm caused by products into which the components are integrated. Section 5 provides:

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or
>
> (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
>
> (b)(2) the integration of the component causes the product to be defective, as defined in this Chapter; and
>
> (b)(3) the defect in the product causes the harm.

*Id.*; *see Schreiner v. Wieser Concrete Prods., Inc.*, 2006 WI App 138, ¶¶ 14–16, 294 Wis. 2d 832, 720 N.W.2d 525 (citing the RESTATEMENT (THIRD) OF TORTS § 5 with approval and noting that although Wisconsin has not previously adopted § 5, it is consistent with Wisconsin law). Based on this, Leavitt argues "a product component such as the steel tubing, should have been treated as an entirely separate product, segregated from questions regarding the AS/RS."

¶ 51. At the time of trial, the parties were in agreement that the AS/RS was defective; the issue was which party was responsible for the defect. In this regard, the record is clear:

> THE COURT: I'm glad you brought this up. For one thing, one of the matters that we discussed on

184

Friday was an agreement on the part of the parties that the structure was defective, and that's included in the instruction that I have drafted.

Everyone agreed that there was a defect in the structure; and what the case is really about is whose responsibility is there, who bears the responsibility, is it the plaintiff because of the plaintiff's own negligence, Quad/Graphics'[] own negligence, is it one of these other parties that we agreed should be on the verdict. So that's one of the matters to put on the record.

¶ 52. With the presumption that the AS/RS was defective, the first two questions on the special verdict were directed solely at Leavitt and were answered as follows:

Question 1:

When the steel tubing left the possession of Leavitt Tube Company was the steel tubing in a defective condition so as to be unreasonably dangerous to a prospective user?

Answer: <u>Yes</u>

*If you answered Question 1 "yes," answer the following question, otherwise do not answer it.*

Question 2:

Was the defective condition of the steel tubing a cause of the collapse of the automated storage retrieval system (AS/RS)?

Answer: <u>Yes</u>

Not only do these questions place the material issues of fact regarding Leavitt's tubing in front of they jury, they follow the liability test found in RESTATEMENT (THIRD) OF TORTS § 5(a), that "the component is defective in itself, . . . and the defect causes the harm." Moreover, they

185

were essentially consistent with questions proposed by Leavitt prior to trial.[12]

¶ 53. Notwithstanding the first two questions, Leavitt takes issue with special verdict question nine, which it contends "lumped Leavitt together with the other defendants who were responsible for creating the AS/RS." Question nine read:

Question 9:

Assuming the total conduct of the parties to which you answered "yes" to be 100%, what percentage do you attribute to:

| | |
|---|---|
| a-Leavitt Tube Company | 10% |
| b-HK Systems, Inc. | 51% |
| c-Rack Structures, Inc. (RSI) | 39% |
| d-Graef Anhalt, Schloemer & Associates, Inc. (GAS) | 0% |
| Total | 100% |

By formulating question nine in this fashion, as opposed to incorporating separate comparison questions for the AS/RS and the tubing, Leavitt submits that the special verdict failed to "treat[] this case as the two-product case that it was."

¶ 54. Leavitt also asserts that question twelve, "which only had direct comparisons between Quad and

---

[12] Leavitt proposed the following:

**QUESTION 3:** At the time that the 4 x 4 steel tubing left the possession of Leavitt Tubing Co., LLC, was the 4 x 4 steel tubing in a defective condition so as to be unreasonably dangerous to a prospective user.

**QUESTION 4:** If you answered Question No. 3 "yes," then answer this question; otherwise, do not answer it: Was the defective condition of the 4 x 4 steel tubing a cause of Quad/Graphics' damages?

the AS/RS," is problematic. Question twelve was left blank by the jury in accordance with the instructions provided to it on the verdict form.

Question 12:

Assuming that the defect(s) or defective condition(s) and Quad/Graphics' negligence together caused 100% of the collapse, what percentage do you attribute to:

The defect(s)/defective condition(s) of the AS[/]RS ___%
Quad Graphics ___%
Total 100%

According to Leavitt, the question should have asked for a comparison of Quad's contributory negligence to the defects in the steel tubing and the defects in the AS/RS.[13]

¶ 55. Here, the jury found that the Leavitt tubes were in a defective condition so as to be unreasonably dangerous and that the defective condition of the steel tubing was a cause of the collapse of the AS/RS. The jury further determined that Quad was not negligent. IRI/Quad explains:

[13] According to Leavitt, this question should have read:

**QUESTION 7:** . . . Assuming 100% as the total amount of negligence of Quad/Graphics and defective condition of the AS/RS and defective condition of the 4 x 4 steel tubing which caused the damages to Quad/Graphics, what percentage of the damages do you attribute to:

(a) Quad/Graphics, Inc. ___%

(b) The AS/RS ___%

(c) The 4 x 4 steel tubing ___%

 Total: 100

187

> Under Leavitt's proposed special verdict, Leavitt would be the only defendant listed on the defendant comparison question as it relates to the steel tubing. Therefore, any percentage the jury assigned to the steel tubing in the plaintiff-to-product comparison would be directly assigned to Leavitt. This would essentially have the same effect as assigning responsibility to Leavitt in a defendant comparison question.[14]

(Footnote added.) Thus, even if there were errors relative to the comparison questions, Leavitt's argument is unclear as to how the outcome would have been different if its proposed special verdict had been used. *See State v. Dyess*, 124 Wis. 2d 525, 543–44, 547, 370 N.W.2d 222 (1985) (stating that an error is harmless in a criminal case if there is no reasonable possibility that the error contributed to the outcome of the case); *see also Town of Geneva v. Tills*, 129 Wis. 2d 167, 184–85, 384 N.W.2d 701 (1986) (applying the *Dyess* prejudice formulation to civil cases).

**4. Did the trial court err when it admitted evidence of eddy current testing related to Leavitt's manufacturing process or when it precluded Leavitt from cross-examining a witness regarding various construction issues?**

¶ 56. Leavitt contends evidence of eddy current testing related to its manufacturing process should not have been admitted. In addition, it asserts that it

---

[14] In its proposed special verdict, Leavitt listed itself and O'Neal Steel, Inc. (O'Neal) in the comparison question related to steel tubing. RSI ordered the tubes at issue from O'Neal, which in turn ordered the tubes from Leavitt. O'Neal was not included on the verdict. Thus, as IRI/Quad points out, Leavitt would have been the only defendant listed on the comparison question related to steel tubing.

should have been allowed to cross-examine an HK employee regarding various construction issues. We address each argument in turn.

■■

¶ 57. The decision to admit or exclude evidence is vested in the trial court's reasoned discretion. *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). "An appellate court will sustain an evidentiary ruling if it finds that the [trial] court examined the relevant facts; applied a proper standard of law; and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach." *State v. Sullivan*, 216 Wis. 2d 768, 780–81, 576 N.W.2d 30 (1998).

¶ 58. Eddy current testing is a nondestructive method of weld testing that can be used during the steel tube manufacturing process. Prior to trial, the court precluded evidence on eddy current testing; however, when IRI/Quad raised the issue during trial, the court ultimately admitted such evidence. In explaining its reasoning for admitting the evidence:

> I also reviewed last **Sumnicht** [*v. Toyota Motor Sales, U.S.A., Inc.*, 121 Wis. 2d 338, 360 N.W.2d 2 (1984)], which discusses that in Wisconsin the plaintiff need not prove the feasibility of the remedy to prove a defect, but that such evidence is indeed relevant.
>
> I did not intend my [earlier] ruling to enable Leavitt to insinuate to this jury that non-destructive testing is not feasible; and I certainly did not intend to deprive the plaintiffs unfairly of their ability to prove that eddy current testing, non-destructive testing, is commercially feasible.
>
> Given last Thursday's testimony the very careful balance that I have to undertake in connection with [Wis. Stat. §] 904.03 has changed. I can't say at this

point in the trial that the probative value of the installation of eddy current testing at Leavitt Tubing is unfairly prejudicial to Leavitt. I can't say that [the] probative value is outweighed by unfair prejudice.

I have thought this over with a great deal of care after reviewing all of the circumstances of the case as I understand them and in particular the cross-examination of Dr. O'Donnell [Quad's expert].

If anything, the concern that I have at this point is that to continue to restrict the plaintiffs from introducing this evidence will mislead the jury to conclude that eddy current testing is not feasible, too expensive, or otherwise impracticable when indeed the evidence is that it is—the evidence that they have not heard is that it is quite feasible.

(Bolding and italics added; underlining omitted.)

¶ 59. Leavitt argues the evidence of eddy current testing was irrelevant and prejudicial. It breaks the evidence into four categories: (1) evidence "that Leavitt did not use eddy current testing on the mill that produced the component part of the structure"; (2) evidence "that Leavitt used eddy current testing on another mill at the time the subject steel tubing was made"; (3) evidence "that Leavitt implemented the type of testing on the subject mill after the collapse"; and (4) evidence "of Leavitt's decision to purchase and implement the testing, which was installed after the collapse."

¶ 60. According to Leavitt, this evidence was irrelevant because Wisconsin uses a consumer contemplation test to determine liability in strict products liability actions. *See Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, ¶¶ 29, 34, 245 Wis. 2d 772, 629 N.W.2d 727 (" '[T]he test in Wisconsin of whether a

product contains an unreasonably dangerous defect depends upon the reasonable expectations of the ordinary consumer concerning the characteristics of this type of product.' ") (citation and emphasis omitted). Leavitt asserts that under the consumer contemplation test, the focus is on whether the product itself is defective and unreasonably dangerous, not the manner in which it was manufactured. By admitting this evidence, Leavitt claims IRI/Quad was allowed to invoke negligence principles in a strict product liability case in that the focus was on Leavitt's conduct as opposed to the product. *See id.*, ¶ 56 ("[U]nlike negligence liability, strict products liability focuses not on the defendant's conduct, but on the nature of the defendant's product.").

¶ 61. In *Sumnicht*, the court provided five additional relevant factors that can be considered when determining if a product is defective and unreasonably dangerous:

> "1) [C]onformity of defendant's design to the practices of other manufacturers in its industry at the time of manufacture; 2) the open and obvious nature of the alleged danger; . . . 3) the extent of the claimant's use of the very product alleged to have caused the injury and the period of time involved in such use by the claimant and others prior to the injury without any harmful incident. . . . 4) the ability of the manufacturer to eliminate danger without impairing the product's usefulness or making it unduly expensive; and 5) the relative likelihood of injury resulting from the product's present design."

*Id.*, 121 Wis. 2d at 372 (citation omitted; ellipses and bracketing in *Sumnicht*); *see Green*, 245 Wis. 2d 772, ¶¶ 32–33 (noting that while the *Sumnicht* factors did not alter Wisconsin's consumer-contemplation test, they "are considerations that may be relevant to determining whether the ordinary consumer could antici-

pate and, hence, contemplate an alleged unreasonably dangerous defect").

¶ 62. In light of *Sumnicht*'s making relevant " 'the ability of the manufacturer to eliminate danger without impairing the product's usefulness or making it unduly expensive,' " *see id.*, 121 Wis. 2d at 372 (citation omitted), we cannot conclude that the trial court erred in deeming relevant the evidence related to the fact that eddy current testing was commercially feasible, *see* Wis. Stat. § 904.01 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). In its reply brief, Leavitt asserts that evidence of "feasibility" should only have been allowed "to demonstrate that, given the inherent nature or cost of the product, the ordinary consumer may expect the product to have more or less safety devices." *See Green*, 245 Wis. 2d 772, ¶ 33 (addressing the *Sumnicht* factor related to " 'the ability of the manufacturer to eliminate danger without impairing the product's usefulness or making it unduly expensive' " and concluding "this factor allows parties to show that due to the inherent nature or cost of a particular product, the ordinary consumer may expect, for example, the product to include more or less safety devices"). Leavitt asserts that contrary to these parameters, IRI/Quad presented the evidence as a criticism of Leavitt's manufacturing process. In this context, we will address Leavitt's argument that admitting the evidence was error because it was prejudicial.

¶ 63. "Although relevant, evidence may be excluded if its probative value is substantially outweighed

192

by the danger of unfair prejudice." WIS. STAT. § 904.03. The critical determination, of course, is that before this provision is implicated, the prejudice, the danger of which is assessed, must be "unfair." *Lease Am. Corp. v. Insurance Co. of N. Am.*, 88 Wis. 2d 395, 401, 276 N.W.2d 767 (1979) (evidence is unfairly prejudicial if it tends to influence the outcome by improper means, appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes it to base decisions on something other than established propositions in the case).

¶ 64. The record reflects that IRI/Quad cross-examined Leavitt's quality control director about the fact that eddy current testing was available and was feasible at the time Leavitt manufactured the tubes for the project but that Leavitt was not using it. Leavitt had one other mill utilizing such testing at the time the tubing was made for the AS/RS. Leavitt's president testified that on July 10, 2002 (two days before the collapse of the AS/RS), he signed an authorization for the purchase of eddy current testing for the mill where the tubing for the AS/RS had been manufactured.

■■

¶ 65. This evidence could have been offered by IRI/Quad "to show that due to the inherent nature or cost of a particular product, the ordinary consumer may expect, for example, the product to include more or less safety devices." *See Green*, 245 Wis. 2d 772, ¶ 33. While Leavitt certainly believes it was prejudicial, in light of *Sumnicht* and our deferential review of a trial court's evidentiary determinations, we cannot conclude that it was unfairly so.

¶ 66. Finally, Leavitt contends that the trial court erred when it did not allow Leavitt to fully cross-examine HK employee, Barry Johnson. Leavitt sought

to question Johnson regarding a host of issues that it contends were "critical to establishing Quad's contributory negligence." Among other things, these issues, as described by Leavitt, included: "Mr. Johnson learned from Carl Lentz of Quad that there were weld problems at the north end of the structure in the first seven bays"; "HK and Quad became aware that the bolts anchoring the rack structure were not embedded properly [and] RSI advised HK and Quad that its installer used the wrong length bolt"; and "HK learned that the rack structure was 'out of plumb' and 'out of tolerance' of HK's specifications, meaning that the structure was not standing up as straight as it should be." The foregoing testimony from Johnson, Leavitt asserts, would have revealed that Johnson was aware of numerous problems during the installation of the AS/RS, as was Quad, and that as such, Quad was contributorily negligent for continuing to load the AS/RS.

¶ 67. After opposing counsel objected to the introduction of such testimony, the trial court made the following record:

> As I understood the objection that was being advanced by St. Paul and joined in by the plaintiffs the concern is this: In a project such as this . . . it is likely that a number of matters will go wrong during the course of the design and construction of the structure. And if the, if as part of its defense Leavitt is permitted to put in front of the jury evidence of everything that went wrong, that will confuse the jury; and it is also irrelevant.
>
> The concern, as I understand it, is that the areas that [Leavitt's counsel] wanted to explore had no causal nexus to the collapse.
>
> So what I said in chambers was that it was analogous to my building a home and hiring someone who is

194

installing defective tiles, and then later on someone wants to bring out that fact with respect to my roof leaking saying that I should have known better because these people were putting in bad tile.

I imagine that there might be, speaking theoretically, a situation where there is such egregious negligence on the part of a contractor or subcontractor that someone might opine that this was just beyond any normal construction site or what was happening there fell below industry standards to such a degree that there is some sort of causal nexus.

But from what I have been told by the parties, there is no expert that is prepared to render such an opinion; and I determined that it would be wasteful, inefficient, and confusing to put before the jury evidence of every single thing that went wrong in this project or of truly anything unless it is related to the collapse of the structure.

¶ 68. Leavitt argues that the trial court erred in its ruling on this issue because the evidence was relevant and did not require expert testimony. While the evidence may have been relevant, the trial court did not err in concluding that expert testimony was required.

¶ 69. "[I]n strict product liability cases . . . the jury is asked to apportion the extent to which the plaintiff's injuries were attributable to his own contributory negligence as compared to the product's defectiveness." *Fuchsgruber*, 244 Wis. 2d 758, ¶ 20. "Generally, expert testimony is not required for proof of negligence." *City of Cedarburg Light & Water Comm'n v. Allis-Chalmers Mfg. Co.*, 33 Wis. 2d 560, 566, 148 N.W.2d 13 (1967), *modified by* 33 Wis. 2d 560, 149 N.W.2d 661 (1967). However, when "the question of

negligence rests on facts or principles which would be extremely difficult for a conscientious juror to comprehend, the trial court may decline, upon motion, to permit the case to go to the jury in the absence of expert testimony on the negligence issue." *Id.* at 567; *see also State v. Whitaker*, 167 Wis. 2d 247, 255–56, 481 N.W.2d 649 (Ct. App. 1992) ("[E]xpert testimony is *required* only if the issue to be decided by the jury is beyond the general knowledge and experience of the average juror. Expert testimony is *permitted,* however, even though it may not be required, when it will assist the trier of fact to understand the evidence.") (citations and internal quotation marks omitted; emphasis in *Whitaker*). "The lack of expert testimony in such cases constitutes an insufficiency of proof." *Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis. 2d 147, 152, 172 N.W.2d 427 (1969).

¶ 70. To establish contributory negligence on Quad's part, Leavitt sought to introduce evidence that would show that Quad was aware of numerous problems during the installation of the AS/RS and that Quad and HK "should not have relied upon the representations of RSI, a party that had demonstrated [its] gross incompetence throughout the construction process." Prior to the trial, in all likelihood, the average juror had never heard of an AS/RS-type system. Given the sophisticated nature of the multimillion dollar AS/RS project, whether the issues Leavitt sought to cross-examine Johnson on were minor matters, wholly unrelated to the collapse, that one would expect to arise in a project of this scale or whether they were major issues central to causing the collapse, needed to be explained through expert testimony in order for the jury to assess Quad's contributory negligence. Likewise, whether in a project of this magnitude, it was proper for Quad to rely on representations made by RSI is outside

196

the province of a typical juror. Accordingly, the trial court properly exercised its discretion in not permitting the additional cross-examination of Johnson sought by Leavitt.

## B. IRI/Quad's Cross-Appeal.

### 1. Was IRI/Quad's settlement offer to Leavitt valid under Wis. Stat. § 807.01?[15]

¶ 71. Turning to the cross-appeal, IRI/Quad contends that the trial court erred when it held that IRI/Quad's settlement offer to Leavitt was invalid under Wis. Stat. § 807.01. IRI/Quad argues it is entitled to interest and double costs because Leavitt was found liable to it for an amount greater than that provided in its settlement offer.

¶ 72. IRI/Quad made an offer of settlement in March 2004 to Leavitt. It was captioned "Quad/Graph-

---

[15] Wisconsin Stat. § 807.01 provides, in relevant part:

(3) After issue is joined but at least 20 days before trial, the plaintiff may serve upon the defendant a written offer of settlement for the sum, or property, or to the effect therein specified, with costs. If the defendant accepts the offer and serves notice thereof in writing, before trial and within 10 days after receipt of the offer, the defendant may file the offer, with proof of service of the notice of acceptance, with the clerk of court. If notice of acceptance is not given, the offer cannot be given as evidence nor mentioned on the trial. If the offer of settlement is not accepted and the plaintiff recovers a more favorable judgment, the plaintiff shall recover double the amount of the taxable costs.

(4) If there is an offer of settlement by a party under this section which is not accepted and the party recovers a judgment which is greater than or equal to the amount specified in the offer of settlement, the party is entitled to interest at the annual rate of 12% on the amount recovered from the date of the offer of settlement until the amount is paid. Interest under this section is in lieu of interest computed under ss. 814.04 (4) and 815.05 (8).

ics, Inc. and Industrial Risk Insurers' Offer of Settlement" and consisted of one line: "Pursuant to Wis. Stat. § 807.01(3), plaintiffs offer to settle all claims against Leavitt Tubing Company, LLC for $7,000,000.00, with costs." (Underlining in original.) Leavitt did not accept the offer.

¶ 73. In 2007, IRI/Quad entered into an agreement with Leavitt and its primary insurer. This agreement specified that IRI/Quad "reserve[d] all claims against Leavitt to the extent and only to the extent that HK has coverage under the LMC [Lumbermens] policy." This agreement also contained an express reservation of rights, which read: "Quad Graphics and IRI expressly reserve all claims and causes of action against Leavitt for which Leavitt has coverage under the LMC [Lumbermens] policy (including claims for prejudgment interest under W.S.A. 807.01(3)), but only to the extent that Leavitt has such coverage." (Parenthetical in original.)

¶ 74. Lumbermens' policy, which had a $20,000,000 limit, contained a provision regarding supplementary payments it would make: "We will pay with respect to any claim we investigate or settle, or any 'suit' against an insured we defend: . . . Prejudgment interest awarded against the insured on that part of the judgment we pay . . . . These payments will not reduce the limits of insurance."

¶ 75. In refusing to award IRI/Quad interest and double costs under Wis. Stat. § 807.01, the court stated:

> That's the problem that I have with your offer of settlement. As I understand it—leaving aside all of their arguments, as I understand it it's a joint offer of settlement; and while the bulk of the loss goes to IRI, Quad/Graphics has an independent loss. And as I understand it, it was a joint offer of settlement from you together as plaintiffs towards the defendants.

[COUNSEL FOR IRI/QUAD]: Without a doubt, judge, it's a joint offer of settlement on behalf of [Quad] and IRI. Without a doubt the amount of money paid by IRI was $59,000,000, and that the uninsured portion incurred by Quad/Graphics was relatively speaking a smaller amount over and above that. Those things are all true.

My position is the same. It's still an indivisible injury caused by the collapse of this defective unreasonably dangerous AS/RS. The parties are—I mean, that's what subrogation is. We are literally standing in the shoes of Quad/Graphics.

THE COURT: Well, that's the problem that I have in that the courts, the higher courts seem to treat this as a relatively harsh result. Whether that's true or not is not for me to decide, but they seem to have a technical bent about this.

[COUNSEL FOR IRI/QUAD]: . . . Quad's damages are not unique from IRI's damages . . . .

THE COURT: Well, my best reading of . . . *Schwochert* [*v. American Family Mutual Insurance Co.,* 139 Wis. 2d 335, 407 N.W.2d 525 (1987),] is that the offer that was made does not meet the provisions of case authority; and maybe a higher court will see this differently as they may see other things differently.[16]

(Bolding, italics, and footnote added; underlining omitted.)

---

[16] In *Wood v. American Family Mutual Insurance Co.*, 148 Wis. 2d 639, 649, 436 N.W.2d 594 (1989), *overruled in part on other grounds by Matthiesen v. Continental Cas. Co.*, 193 Wis. 2d 192, 202, 532 N.W.2d 729 (1995), the court withdrew some language from *Schwochert v. American Family Mutual Insurance Co.*, 139 Wis. 2d 335, 407 N.W.2d 525 (1987). The withdrawn language has no bearing on our consideration of

¶ 76. IRI/Quad submits that WIS. STAT. § 807.01 did not require it to make separate offers of settlement because IRI/Quad's interests were aligned. IRI/Quad asserts that regardless of how IRI/Quad split the money, Leavitt knew what it would cost to settle. Leavitt disagrees, arguing that the offer of settlement did not enable it and Lumbermens to fully and fairly evaluate their exposure. *See Testa v. Farmers Ins. Exch.*, 164 Wis. 2d 296, 302, 474 N.W.2d 776 (Ct. App. 1991) (explaining, "for purposes of invoking the double costs and interest provisions of [WIS. STAT. § ] 807.01 . . . in order for the offer to be effective, the offeree must be able to fully and fairly evaluate the offer from his own independent perspective").

¶ 77. The determination of whether IRI/Quad is entitled to interest and double costs requires application of WIS. STAT. § 807.01(3) and (4), a question of law subject to our *de novo* review. *See Osman v. Phipps*, 2002 WI App 170, ¶ 9, 256 Wis. 2d 589, 649 N.W.2d 701. "It is the obligation of the party making the offer to do so in clear and unambiguous terms, with any ambiguity in the offer being construed against the drafter." *Staehler v. Beuthin*, 206 Wis. 2d 610, 625, 557 N.W.2d 487 (Ct. App. 1996).

¶ 78. IRI/Quad contends that its settlement offer to Leavitt enabled Leavitt and Lumbermens to fully and fairly evaluate the offer. IRI/Quad asserts that Lumbermens knew the amount of insurance coverage available to Leavitt and could evaluate what portion of its excess limits would be required to accept the settle-

*Schwochert* in this case. Furthermore, it has been held that the rest of *Schwochert* "is still the law in Wisconsin." *See Schwochert v. American Family Mut. Ins. Co.*, 172 Wis. 2d 628, 636, 494 N.W.2d 201 (1993) (on appeal after remand).

200

ment offer. Consequently, IRI/Quad asks us to conclude that the settlement offer to Leavitt was valid such that IRI/Quad is entitled to interest and double costs. Leavitt and Lumbermens disagree, contending that "the offer was presented in an ambiguous manner, not clearly articulating whether the offer was being made to Leavitt, Leavitt's insurers, or a combination of both."

¶ 79. To resolve this issue we review the relevant case law, starting with *White v. General Casualty Co. of Wisconsin*, 118 Wis. 2d 433, 348 N.W.2d 614 (Ct. App. 1984). There, the court addressed whether a joint settlement offer made on behalf of individual family members in a personal injury action was valid. *Id.* at 438–39. After analyzing WIS. STAT. § 807.01(3) and (4), the court concluded that the provisions "do not apply to cases involving a joint offer of settlement made on behalf of individual plaintiffs." *White*, 118 Wis. 2d at 439–40. The court was concerned that allowing joint settlement offers would "unreasonably force defendants to settle a case because of the leverage exerted by the possibility of an aggregate judgment in excess of the joint settlement offer even though, as to individual plaintiffs in the lawsuit, a settlement offer would have been legitimately rejected." *Id.* at 439.

¶ 80. In *DeMars v. LaPour*, 123 Wis. 2d 366, 366 N.W.2d 891 (1985), the court again was asked to determine whether a joint settlement offer was valid under WIS. STAT. § 807.01(3) and (4). There, an injured employee, his wife, and the worker's compensation carrier for his employer submitted a joint offer of settlement to the defendants after the employee was seriously injured when he fell at work. *Id.* at 368–69. The injured employee sought to recover for personal injuries he sustained; his wife sought to recover for loss of society, companionship, and consortium; and the worker's com-

pensation carrier sought to recover amounts paid to the employee under it worker's compensation policy. *Id.* at 368. The *DeMars* court, relying on *White*, concluded that the offer of settlement was not valid because "[t]he plain language of [Wis. Stat. § 807.01] indicates that separate offers of settlement must be made by each individual plaintiff." *DeMars*, 123 Wis. 2d at 372. The court in *Schwochert*, which was cited by the trial court in this matter, applied the holdings in *White* and *DeMars* and likewise invalidated an offer of settlement made by multiple family members in an action for wrongful death and for injuries resulting from a motor vehicle accident. *See Schwochert*, 139 Wis. 2d at 351–52.

¶ 81. According to IRI/Quad, *White, DeMars*, and *Schwochert* are not controlling here because those cases involved personal injury claims where each plaintiff's damages "were unique and unliquidated." IRI/Quad asserts that "the concern raised in those cases does not materialize where there is a known (and unchallenged) amount of damages, there is not a 'wild card' amount such as pain and suffering, and one of the plaintiffs is a subrogated insurer." (Parenthetical in brief.)

¶ 82. IRI/Quad relies on basic principles of subrogation regarding the alignment of interests between an insurer and its insured to support its contention that separate offers of settlement were not required. *See Pitts v. Revocable Trust of Knueppel*, 2005 WI 95, ¶ 34, 282 Wis. 2d 550, 698 N.W.2d 761 ("The insurer, in some circumstances, steps into the shoes of its insured and may prosecute the tortfeasor to recoup the benefits it paid to its insured."); *Cunningham v. Metropolitan Life Ins. Co.*, 121 Wis. 2d 437, 444, 360 N.W.2d 33 (1985) ("The doctrine of subrogation, when applied in the insurance context, deals with the right of the insurer to be put in the position of the insured in order to pursue

202

recovery from third parties, legally responsible to the insured, for a loss paid by the insurer to the insured."). Consequently, IRI/Quad claims, although "[h]ere, the offer was from the subrogated insurer—IRI—and its insured—Quad—to HK and to Leavitt . . . that distinction makes no difference to accomplish the purpose of Wis. Stat. § 807.01." We agree that these circumstances, where Quad and IRI, as Quad's subrogated insurer, submitted a joint offer of settlement, distinguish this matter from the circumstances presented in *White, DeMars,* and *Schwochert.*

¶ 83. Support for IRI/Quad's position can be found in *Staehler,* where we concluded "that when a defendant offers a settlement to the principal plaintiff with the condition that the plaintiff also indemnify any existing related subrogated claim, the plaintiff can properly evaluate the offer and it is therefore valid." *Id.,* 206 Wis. 2d at 615. From this, IRI/Quad argues: "Given that a single offer of settlement *to* an insured and its subrogated insurer is valid under Wis. Stat. § 807.01, *Staehler,* 206 Wis. 2d at 626–28, it logically follows that a single offer of settlement *from* an insured and its subrogated insurer is also valid under that statute." (Emphasis in brief.) Again, we agree.

¶ 84. Furthermore, in our recent decision in *Hadrian v. State Farm Mutual Automobile Insurance Co.,* 2008 WI App 188, 315 Wis. 2d 529, 763 N.W.2d 215, we reviewed the sufficiency of an offer of settlement in a lawsuit arising out of an automobile accident. There, the plaintiff served a one-sentence offer to settle on the defendants, devoid of any reference to the claim of the plaintiff's employer, which was named in the action due to payments it made on the plaintiff's behalf under its self-funded health insurance plan. *Id.,* ¶ 9. The offer to settle read: " 'Pursuant to Section 807.01(3) of the

Wisconsin Statues, the Plaintiff hereby offers to settle the above entitled action for the sum of $350,000.00 including costs and disbursements.' " *Id.*, ¶ 4. We concluded that the offer of settlement was unenforceable because the defendants were not able to determine whether it encompassed the employer's claim. *Id.*, ¶ 9. We stated: "Where . . . the case involves a subrogated party with a separate claim against the defendants, the plaintiff's offer of settlement must account for that separate claim." *Id.*, ¶ 8.

■■■■

¶ 85. IRI/Quad asserts that pursuant to *Hadrian*, a single offer of settlement from an insured and its subrogated carrier is valid under WIS. STAT. § 807.01, provided that it makes clear that it covers both the subrogated claim as well as the insured's claim. It submits that its offer was clear in this regard as it began: "Pursuant to Wis. Stat. § 807.01(3), plaintiffs offer to settle all claims . . . ." (Underlining added.) Moreover, the caption of the offer of settlement to Leavitt made clear that it encompassed both Quad and IRI's claims. The caption read: "Quad/Graphics, Inc. and Industrial Risk Insurers' Offer of Settlement." Unlike the situation presented in *Hadrian*, here we conclude that the offer of settlement is enforceable because it was clear that it encompassed both Quad and IRI's claims. *Cf. Hadrian*, 2008 WI App 188, ¶¶ 8–9. Accordingly, IRI/Quad is entitled to recover interest and double costs pursuant to WIS. STAT. § 807.01(3) and (4).

¶ 86. Based upon the forgoing, we remand this case in order for judgment to be entered which includes double costs and interest pursuant to WIS. STAT. § 807.01.[17]

---

[17] As this opinion was circulating, immediately prior to release, the court was notified that IRI/Quad voluntarily dis-

*By the Court.*—Judgment modified and, as modified, affirmed; cross-appeal reversed and cause remanded with directions.

missed its cross-appeal against St. Paul and that St. Paul voluntarily dismissed its appeal.