**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 29, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **20AP1239-FT**

Cir. Ct. No. **94ME28D**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

IN THE MATTER OF THE MENTAL COMMITMENT OF L. E.:

PORTAGE COUNTY,

    PETITIONER-RESPONDENT,

  V.

L. E.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Portage County: ROBERT J. SHANNON, Judge. *Affirmed*.

¶1    KLOPPENBURG, J.[1]   L.E. appeals orders from the Portage County Circuit Court extending her involuntary commitment and ordering involuntary medication and treatment as requested by Portage County pursuant to WIS. STAT. ch. 51.  L.E. contends that the County failed to prove that she is dangerous or that she is incompetent to refuse medical treatment.  I affirm the court's orders.

## BACKGROUND

¶2    L.E. was first subject to WIS. STAT. ch. 51 orders for involuntary commitment and involuntary medication and treatment in 1994.  These orders have been extended multiple times.  In January 2020, the County filed a petition requesting orders granting a 12-month extension of the most recent commitment and authorizing involuntary medication and treatment.  The circuit court held a recommitment hearing, at which it determined that L.E. met the statutory requirements for recommitment because she is mentally ill, is treatable, and would be a proper subject for commitment if her treatment were withdrawn.  The court further determined that L.E. is incompetent to refuse medication and treatment. The court entered orders extending L.E.'s involuntary commitment for a period of 12 months and authorizing involuntary medication and treatment during the period of commitment.  This appeal follows.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2017-18). In an August 31, 2020 order, the court placed this case on the expedited appeals calendar, and the parties have submitted memo briefs.  *See* WIS. STAT. RULE 809.17(1).  The court issues this opinion approximately 98 days after the notice of appeal was filed and approximately 24 days after the reply brief was filed.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise stated.

¶3     Additional material facts are provided as pertinent in the discussion below.

## DISCUSSION

¶4     I first explain the standard of review and general legal principles governing orders that extend involuntary commitment and authorize involuntary medical treatment.  I next analyze L.E.'s argument and conclude that the evidence was sufficient to support the circuit court's orders extending L.E.'s involuntary commitment and authorizing involuntary medication and treatment.

### I.  Standard of Review and General Legal Principles.

¶5     Review of WIS. STAT. ch. 51 orders for involuntary commitment and for involuntary medication and treatment presents a mixed question of fact and law.  This court upholds a circuit court's findings of fact unless they are clearly erroneous.  ***Waukesha Cnty. v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783 (involuntary commitment); ***Outagamie Cnty. v. Melanie L.***, 2013 WI 67, ¶¶37-38, 349 Wis. 2d 148, 833 N.W.2d 607 (involuntary medication and treatment).   Whether those facts fulfill the statutory requirements for an involuntary commitment presents a question of law that this court reviews de novo.  ***J.W.J.***, 375 Wis. 2d 542, ¶15; ***Melanie L.***, 349 Wis. 2d 148, ¶¶38-39.

¶6     The criteria for extending an involuntary commitment are governed by WIS. STAT. § 51.20(13)(g).  That paragraph is read together with the criteria set forth in § 51.20(1)(a).  Under § 51.20(1)(a), a circuit court may order the initial commitment of an individual if the petitioner shows, by clear and convincing evidence, that the individual is:

(1)   mentally ill;

(2)   a proper subject for treatment; and

(3)   currently dangerous under one of five alternative dangerousness standards.

*See* § 51.20(1)(a)1. and 2.a.-e. and (13)(e); ***Portage Cnty. v. J.W.K.***, 2019 WI 54, ¶¶17, 24, 386 Wis. 2d 672, 927 N.W.2d 509; *see also* WIS JI—CIVIL 7050. With regard to the third prong noted above, § 51.20(1)(a)2.a.-e. identifies five separate dangerousness standards, each of which includes a requirement of recent acts or omissions demonstrating that the individual is a danger to herself or others. *See* Sec. 51.20(1)(a)2.a.-e.; ***J.W.K.***, 386 Wis. 2d 672, ¶17.

¶7      Once an individual is subject to a WIS. STAT. ch. 51 commitment order, the petitioner (in this case, Portage County) may, before the expiration of the initial commitment, petition for the extension of that commitment under WIS. STAT. § 51.20(13)(g)3. *See* ***J.W.K.***, 386 Wis. 2d 672, ¶18. In order for the extension to be granted, the petitioner must prove by clear and convincing evidence that the individual is: (1) mentally ill, (2) a proper subject for treatment, and (3) dangerous. *See* Sec. 51.20(1)(a) and (am), and (13)(e) and (g)3.; ***J.W.K.***, 386 Wis. 2d 672, ¶¶18, 24. Proof of the third prong (dangerousness) is the point at which an initial commitment and a recommitment may materially differ. On a petition for recommitment, the petitioner may show that the individual is dangerous under § 51.20(1)(am). *See* ***J.W.K.***, 386 Wis. 2d 672, ¶19 (stating that § 51.20(1)(am) "provides a different avenue for proving dangerousness").

¶8      WISCONSIN STAT. § 51.20(1)(am) provides in pertinent part:

> If the individual has been the subject of inpatient treatment for mental illness … immediately prior to commencement of the proceedings as a result of … a commitment or protective placement ordered by a court under this section … the requirements of a recent overt act, attempt or threat to act under par. (a)2.a. or b., pattern of recent acts or omissions under par. (a)2.c. or e., or recent behavior under par. (a)2.d. may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

Our supreme court has held that § 51.20(1)(am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." *J.W.K.*, 386 Wis. 2d 672, ¶19. Thus, § 51.20(1)(am) "functions as an alternative evidentiary path" for showing dangerousness, "reflecting a change in circumstances occasioned by an individual's commitment and treatment" and "acknowledg[ing] that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)2.a.-e." *Id.*, ¶¶19, 24.

¶9     However, dangerousness remains an element to be proven to support the extension of an involuntary commitment, with reference to the specific dangerousness standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. *Id.*, ¶19; *see also* **Langlade Cnty. v. D.J.W.**, 2020 WI 41, ¶34, 391 Wis. 2d 231, 942 N.W.2d 277. Two of those standards are pertinent here. A person is dangerous within the meaning of WIS. STAT. § 51.20(1)(a)2.c. (the third standard) if the individual has "such impaired judgment … that there is a substantial probability of physical impairment or injury to himself or herself." Sec. 51.20(1)(a)2.c. A person is dangerous within the meaning of § 51.20(1)(a)2.d. (the fourth standard) if the

individual is unable to satisfy basic needs for nourishment, medical care, shelter, or safety, causing substantial probability of imminent death or harm. Sec. 51.20(1)(a)2.d.

¶10     The criteria for ordering involuntary medication and treatment are governed by WIS. STAT. § 51.61(1)(g)4., as follows:

> [A]n individual is not competent to refuse medication or treatment if, because of mental illness, developmental disability, alcoholism or drug dependence, and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the individual, one of the following is true:
>
>      a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
>      b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

WIS. STAT. § 51.61(1)(g)4.a.-b.   The petitioner bears the burden of proving that one of the above conditions is met by clear and convincing evidence. *Melanie L.*, 349 Wis. 2d 148, ¶55.

## II.  Analysis.

¶11     L.E. contends that the County failed to establish by clear and convincing evidence that she is dangerous and that she is incompetent to refuse medical treatment.[2]   I first summarize the pertinent testimony and the circuit

---

[2] L.E. does not contend that the County failed to meet its burden of showing that she is mentally ill or that she is a proper subject for treatment. *See* WIS. STAT. § 51.20(1)(a)1.

court's findings, and then explain why I conclude that the evidence was sufficient to support the circuit court's orders.

## A. Testimony.

¶12 Dr. Wagdy Khalil, a clinical psychiatrist employed by the Portage County Department of Health and Human Services, was the only witness at the evidentiary hearing. The circuit court found his testimony credible. He testified in pertinent part as follows.[3]

¶13 Khalil had been treating L.E. for about four months. L.E. was in an acute, continuous manic state until very recently but is currently stabilized. L.E. has a diagnosis of Bipolar I and she suffers paranoid delusions, mania, depression, and psychosis. She has suffered from mental illness for over thirty years.

¶14 L.E. is currently improved under her current commitment and treatment, which involves living in a group home and taking oral antipsychotic medication. Without medication, L.E. suffers from "severe paranoid delusions" and "acute psychosis" and faces an "extreme risk" of not surviving. L.E. has flooded her house multiple times because of delusion and has no idea why she did so. Without medication, L.E. will become very impulsive and cause harm to herself and others surrounding her. She cannot function on her own.

---

[3] Khalil also submitted an examination report. The report comprises five pages, detailing L.E.'s treatment history, and contains additional support for Khalil's conclusions. As L.E. properly indicates, and the County does not dispute, the County failed to move Khalil's report into evidence. Therefore, I review only Khalil's testimony, despite the inclusion of the report in the record on appeal. *Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶7 n.4, 391 Wis. 2d 231, 942 N.W.2d 277; *Winnebago Cnty. v. S.H.*, 2020 WI App 46, ¶2 n.3, 393 Wis. 2d 511, 947 N.W.2d 761.

¶15     L.E. has refused her medication and will not take her medication voluntarily.  "She is really delusional, paranoid delusion[al] regarding the medication, regarding the people around her.  So she will stop taking the medication."

¶16     L.E. would be a proper subject for commitment if treatment were withdrawn because "she [would] crash" based on her history of noncompliance.  If treatment were withdrawn, L.E. would be a danger to herself and unable to care for herself, based on both her noncompliance history and her experiencing of extreme delusions that would lead to impulsive and endangering behavior, such as when she flooded her house and had no idea why she did so.  "She would [cause] more danger than that.  She is not compliant and she becomes more psychotic.  And I have real[] concerns that she is able to take of herself or even to cause harm to herself and others surrounding her."

¶17     An order to treat is "very essential."  When Khalil examined L.E. she "wasn't competent" to discuss medication and she now has only a very basic competence level:  enough to express, for example, that she does not want to take medication by injection or that she likes or does not like other antipsychotics she has been prescribed in the past.

¶18     No other testimony was offered, and Khalil was not cross-examined.

**B.  Circuit Court's Findings.**

¶19     The circuit court determined that, based on Khalil's testimony, the County clearly and convincingly proved that L.E. is mentally ill and a proper subject for treatment, would be substantially likely to harm herself if her current treatment were withdrawn, and is not competent to refuse treatment.  The court

made the following pertinent findings. L.E. has a history of noncompliance, and she is at a "very high potential risk for decompensation of her illness if she is not required to take the medication and supervised while doing so" which would "be directly contrary to her health." "[W]hen she is not taking the medication, she has paranoid delusions which prevent her from functioning[;] while taking the medication[] those symptoms are significantly reduced." The medication she is taking is "indicated" and "therapeutic" in the treatment of her specific condition. Khalil advised L.E. of the advantages, disadvantages, and alternatives to the medication prescribed but L.E. is unable to understand or appreciate that information due to her mental illness.

## C. Sufficient Evidence.

¶20    L.E. argues that the evidence was not sufficient to support the circuit court's determinations that she is dangerous and not competent to refuse medication and treatment. I address and reject each specific argument in turn.

¶21    L.E. argues that Khalil's testimony about the flooding and risk of not surviving is too vague and equivocal to prove that there is a substantial probability of physical harm (the third dangerousness standard) if L.E.'s treatment were withdrawn. Similarly, L.E. argues that Khalil's testimony that without medication she would be unable to care for herself (the fourth dangerousness standard) lacks any factual foundation. However, as shown above, Khalil's testimony was not so vague, equivocal, or lacking. He testified that she flooded her house multiple times without knowing why, and, more significantly, that she is at extreme risk of not surviving without her medication and that "she [would] crash" because she suffers severe delusions and acts impulsively to such a degree as to risk her health and life. Such details as whether L.E. was at home during the flooding or the

extent of the flooding are not necessary to prove a substantial risk of physical harm to L.E. from her conduct or to prove her inability to satisfy her basic needs if her treatment were withdrawn, given Khalil's description of the severity of the "decompensation" that would result from L.E.'s failure to follow her treatment.

¶22     L.E. argues that this case is like *D.J.W.*, in which our supreme court reversed an involuntary commitment extension order because the evidence was not sufficient to show dangerousness. *D.J.W.*, 391 Wis. 2d 231, ¶3. To the contrary, this case is easily distinguished from *D.J.W.*. In that case, the only testimony as to dangerousness was that D.J.W. would be unable to care for himself if untreated as indicated by the facts that he was living with his parents, he quit his job because of his delusion that he is the Messiah, and he was on disability. *Id.* at ¶¶10-16. D.J.W. also testified, confirming that he believes he is the Messiah, received help from his family, had a job on a farm, and received disability benefits. *Id.* at ¶17. The court concluded that the testimony showed only that without treatment D.J.W. would experience delusions to a greater degree such that he would be unable to maintain a job, would have to rely on disability for income, and would have to continue living with family, but that such consequences do not constitute the substantial probability of death or serious physical injury or impairment that is required under the second and fourth dangerousness standards in the statute. *Id.*, at ¶¶51-57. Here, in contrast, Kahlil did testify that L.E.'s delusions would prevent her from functioning (that "she [would] "crash"") and prevent her from dealing with others, and that the delusions combined with her impulsivity would cause her engage in more dangerous conduct than the flooding, which would harm herself ("extreme risk" of not surviving) and others.

¶23     L.E. argues that Khalil's testimony that she "has just the basic competent level" and is doing well now regarding taking her medication shows

that she is competent to make her own treatment decisions. However, Khalil's reference to basic competence was in terms of L.E.'s not wanting an injection, and his reference to her doing well was in terms of her present compliance under supervision, but Khalil was repeatedly specific about L.E. not being able to understand her need to be subject to the medication and treatment prescribed and her resulting history of noncompliance and he explicitly stated that L.E. was not competent when he examined her. L.E. also argues that Khalil provided no factual basis for his testimony as to what he explained to her about her treatment and what she was capable of understanding. However, L.E. points to no legal authority supporting the proposition that a doctor must repeat the specifics of the advantages, disadvantages, and alternatives that he credibly testified he explained.

¶24    Finally, L.E. argues that this case is akin to *Melanie L.*, in which our supreme court reversed an involuntary medication and treatment order. In that case, the doctor failed to testify about the person's noncompliance and show why that noncompliance demonstrated the person's incapability of understanding the treatment, and the doctor failed to apply the statutory standards but instead articulated a seemingly different standard. *Melanie L.*, 349 Wis. 2d 148, ¶¶9, 90-91. L.E. does not explain how that case supports her position here, and this court will not make an argument for her. *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("we will not abandon our neutrality to develop arguments."); *State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) ("We cannot serve as both advocate and judge.").

¶25    In sum, L.E. fails to show that the evidence was insufficient to show dangerousness and incompetence to refuse medication and treatment.

**CONCLUSION**

¶26    For the foregoing reasons, the orders of the circuit court are affirmed.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.