**COURT OF APPEALS
DECISION
DATED AND FILED**

**December 15, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1567**

Cir. Ct. No. **2019ME7**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF THE MENTAL COMMITMENT OF N. J. P.:

VILAS COUNTY DEPARTMENT OF HUMAN SERVICES,

    PETITIONER-RESPONDENT,

  V.

N. J. P.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Vilas County: NEAL A. NIELSEN III, Judge. *Affirmed*.

¶1 SEIDL, J.[1] John[2] appeals orders committing him to inpatient treatment and involuntary medication for a period of six months. He argues the

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Vilas County Department of Human Services (the Department) failed to establish by clear and convincing evidence that he is dangerous under any of the five standards set forth by WIS. STAT. § 51.20(1)(a)2. We agree with the circuit court that there is clear and convincing evidence that John is dangerous under the fourth standard, § 51.20(1)(a)2.d. Therefore, we affirm.

## BACKGROUND

¶2      On January 28, 2019, investigator Brian Rates of the Lac du Flambeau Tribal Police Department filed a "Statement of Emergency Detention by Law Enforcement Officer," stating that he had cause to believe that John was mentally ill and could cause physical harm to himself or others. According to the detention statement, police department staff had observed John on January 25, 2019, "acting very suspicious as he was video taping the inside of the Police Department and staff, through the lobby window." Rates subsequently made contact with John in a nearby parking lot.

¶3      Rates observed John to have "very dirty, torn, ragg[ed]y clothing." Rates had prior knowledge that John was not allowed at the homeless shelter in the area due to a recent incident involving him. Accordingly, Rates asked John where he was currently staying, to which he responded with "very erratic" statements that "did not make logical sense." In Rates' opinion, John acted "extremely paranoid." After consulting with a Vilas County crisis screener, Rates detained John pursuant to WIS. STAT. § 51.15 because of John's suspicious behavior, incoherent statements, and failure to dress for the subzero temperatures at the time.

---

[2] Following N.J.P.'s lead, and pursuant to policy underlying WIS. STAT. RULE 809.86, we refer to him using the pseudonym "John."

2

¶4      On January 30, 2019, the circuit court held a probable cause hearing. The court found there was probable cause to believe John was mentally ill, a proper subject for treatment, and dangerous to himself or others. The court additionally ordered the involuntary administration of medication, finding probable cause to believe that John was not competent to refuse psychotropic medication or treatment because, due to his mental illness, he was "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … condition in order to make an informed choice as to whether to accept or refuse psychotropic medications."

¶5      A final hearing was held on February 8, 2019. Two witnesses testified at the hearing, Drs. Marshal Bales and Shari Weyenberg, both of whom had filed written reports with the circuit court prior to the hearing.

¶6      Doctor Bales testified he is a psychiatrist with Outagamie County and evaluated John at the Winnebago Mental Health Institute on January 31, 2019. Bales opined that John had bipolar disorder, was "clearly in a manic psychotic state," and had some borderline personality traits. Additionally, Bales testified that John's thought, mood, and perception were substantially impaired and that his judgment, behavior, capacity to recognize reality, and ability to meet the ordinary demands of life were grossly impaired. Bales also testified that he believed John was a proper subject for treatment.

¶7      According to Dr. Bales, John was dangerous "in a number of ways." Relevant to the issues on appeal, Bales testified John would not pursue voluntary treatment. Bales further opined that John would "not … be able to live anywhere. No one can handle him. No homeless shelters. Maybe the jail. But he[] doesn't

have active criminal issues right now. So I just think this is dangerous and he just will not get the help he needs."

¶8      Further, Dr. Bales opined that John was not capable of applying and understanding the advantages and disadvantages of treatment. Bales explained:

> I spoke to the nurse today[] [f]rom his psychiatric unit and [the nurses believe] he's been cheeking and spitting out his medications …. [A]nd with my discussion with him as well[,] [h]e just couldn't have any kind of rational discussion about his medication. He said he was allergic to all of the psychiatric medications. All of them. And he just was irrational. He denies mental illness. But then he wants to blame everybody that tried, the police, the doctors that call[] him mentally ill. He wants to, you know, it's just irrational and paranoid. And he's also manic with this.

Accordingly, Bales thought a medication order was necessary because John would not take medications voluntarily. Bales admitted on cross-examination that the nurses did not know "for sure" whether John had been "cheeking his meds," but Bales testified such conduct was "highly suspected," in part because John made irrational comments about the side effects of certain medicines. Thus, Bales opined that John "needs to get back on his medications and he can transition to outpatient care once they say he's stable."

¶9      Doctor Weyenberg is a psychologist who also examined John in person prior to the hearing. She opined that John had paranoia and met the standard for schizophrenia. Weyenberg testified that John's condition substantially impaired his thought, mood, perception, orientation and/or memory. In her view, John's judgment, behavior, capacity to recognize reality, and ability to meet the ordinary demands of life were grossly impaired by his illnesses. Weyenberg further opined that an involuntary medication order was necessary

because John was incapable of applying and understanding the advantages and disadvantages of receiving psychotropic medications.

¶10    Additionally, Dr. Weyenberg testified John was a proper subject for treatment and was dangerous "[t]o himself as far as [his] ability to care for himself." She explained that her opinion of him being dangerous to himself was based on John's condition at the time of his emergency detention, when "he was wearing clothes that were raggedy, dirty. He had poor hygiene…. [H]e was making comments of paranoia. And … he went out with little clothing. Just a T-shirt. A torn shirt in 20 below zero weather."

¶11    At the close of evidence, the circuit court concluded that the Department "clearly" had met its burden of demonstrating John suffered from a mental illness and that his condition was treatable. The court remarked, however, that whether he was dangerous to himself or others was "razor close." Although the court determined there was insufficient evidence that John was dangerous to others, it ultimately concluded that John was a danger to himself.

¶12    The circuit court found that John, due to the extremely cold weather on the day of his emergency detention, "put himself in a situation where there was a threat of serious physical harm to himself. Based on his grossly impaired judgment." It stated that "it's clear to the Court from [the doctors'] testimony and reports that without adequate treatment, [John's] condition will deteriorate. That means on his own, his circumstances will not improve." It explained further:

> I do find that recent acts of or omissions by [John] due to his mental illness, he's unable to satisfy basic needs for shelter or safety. And perhaps for nourishment or medical care because he doesn't have any insight into his psychiatric needs to a degree that there is a substantial probability that he could suffer serious physical debilitation. Unless he receives that prompt and adequate

> treatment for his illness, he doesn't recognize the need. Doesn't recognize the degree of severity of his illness. And specifically opposes taking medications that will without question provide him relief from current … symptoms and help him. So very close case I think from the element of dangerousness. But I do find sufficient dangerousness based on the factors that I've just addressed.

¶13    Accordingly, the circuit court ordered John committed for six months. The court also ordered John to undergo involuntary medication and treatment during the entire commitment period. John now appeals.[3]

## DISCUSSION

¶14    In order to commit John under WIS. STAT. ch. 51, the Department has the burden to show by clear and convincing evidence that he meets one of the five statutory standards of dangerousness set forth in WIS. STAT. § 51.20(1)(a)2. *See **Langlade Cnty. v. D.J.W.***, 2020 WI 41, ¶23, 391 Wis. 2d 231, 942 N.W.2d 277 (citing WIS. STAT. § 51.20(13)(e)). Whether the Department presented sufficient evidence that John is dangerous under one of the five statutory standards is a mixed question of law and fact. *See **id.***, ¶¶23-24. We will uphold a circuit court's findings of fact unless they are clearly erroneous. ***Id.***, ¶24. Whether the facts satisfy the statutory standard of dangerousness is a question of law that we review independently. ***Id.***, ¶25.

---

[3] Although John indicates in his notice of appeal that he is appealing both the order for commitment and the order for involuntary medication and treatment, he does not develop a separate argument regarding the reversal of the latter order. His position appears to be that if his commitment is unlawful, the involuntary medication and treatment order would then be unlawful as well. Because John makes no developed argument on whether the Department proved the criteria of WIS. STAT. § 51.61(1)(g)4. for the circuit court to order his involuntary medication and treatment, we do not further address that issue. *See **Industrial Risk Insurers v. American Eng'g Testing, Inc.***, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 (stating that this court will not abandon its neutrality to develop arguments for a party).

¶15 As a threshold matter, the parties dispute which standard of dangerousness is at issue on appeal. The fourth statutory standard of dangerousness requires the Department to demonstrate that John

> [e]vidences behavior manifested by recent acts or omissions that, due to mental illness, he … is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless [he] receives prompt and adequate treatment for this mental illness ….

WIS. STAT. § 51.20(1)(a)2.d. For John to be found dangerous under the fifth standard, § 51.20(1)(a)2.e., the Department must demonstrate that

> after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him … and because of mental illness, [John] evidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his … mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his … recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he … will, if left untreated, lack services necessary for his … health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his … thoughts or actions. The probability of suffering severe mental, emotional, or physical harm is not substantial under this subd. 2.e. if reasonable provision for the individual's care or treatment is available in the community and there is a reasonable probability that the individual will avail himself … of these services ….

7

¶16     The circuit court determined John was dangerous under the fourth standard: "I do find that recent acts of or omissions by [John] due to his mental illness, he's unable to satisfy basic needs for shelter or safety."   The written commitment order is consistent with the court's oral pronouncement, in which it notes John "evidences behavior within one or more of the standards under §§ 51.20(1) or (1m), Wis. Stats. *(except for proceedings under §51.20(1)(a)2.e., Wis. Stats.)*"—i.e., the fifth standard.  John thus argues in his brief-in-chief that the court erred because the Department failed to present sufficient evidence that he was dangerous under the fourth standard.

¶17     Surprisingly, the Department responds that we should affirm John's commitment *only* on the fifth standard of dangerousness.  In other words, it makes no appellate argument that there is clear and convincing evidence John is dangerous under the fourth standard.  In fact, the Department maintains that the fourth standard "is inapplicable to the case at bar," even though the circuit court determined John dangerous under the fourth standard.  As a result, John argues in his reply brief that the Department has conceded that there is insufficient evidence of dangerousness to commit John under the first four statutory standards.  *See State v. Hurley*, 2015 WI 35, ¶61 n.20, 361 Wis. 2d 529, 861 N.W.2d 174.

¶18     However, we are not bound by a party's alleged concession, particularly one involving a question of law.  *See id.*; *see also Cramer v. Eau Claire Cnty.*, 2013 WI App 67, ¶11, 348 Wis. 2d 154, 833 N.W.2d 172. Under the circumstances of this case, we decline to deem the Department to have conceded that there was insufficient evidence to commit John under the fourth standard by its failure to respond to his arguments in his brief-in-chief.   The Department's position that the fourth standard is inapplicable to the facts of this case belies the record and plainly ignores the circuit court's decision.   We

therefore proceed to address the merits of John's argument regarding the sufficiency of the evidence on his commitment under the fourth standard, and we decline to address the Department's argument and John's arguments in his reply brief regarding the fifth standard. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (observing that this court need not address an issue when resolution of another issue is dispositive to the appeal).

¶19    We conclude the Department presented clear and convincing evidence that John is dangerous under the fourth standard. John's recent inability to properly dress himself to be outside with temperatures twenty degrees below zero and his inability to live at a homeless shelter or some similar location because "[n]o one can handle him" are evidence that he is unable to satisfy his basic needs for shelter or safety.

¶20    Additionally, Drs. Bales' and Weyenberg's testimony provided evidence that John's inability to satisfy his basic needs is caused by his mental illness. Bales testified John's thought, mood, and perception were substantially impaired and that his judgment, behavior, capacity to recognize reality, and ability to meet the ordinary demands of life were grossly impaired. Similarly, Weyenberg testified John's condition substantially impaired his thought, mood, perception, orientation and/or memory and that John's judgment, behavior, capacity to recognize reality, and ability to meet the ordinary demands of life were grossly impaired. The doctors' testimony provides a reasonable explanation to why John was outside in subzero temperatures without proper attire, and, thus, is evidence that John cannot satisfy his basic needs due to his mental illness.

¶21    Finally, the doctors' testimony provided evidence that a substantial probability exists in which John could incur imminent death, serious physical

injury, debilitation, or disease unless he received prompt and adequate treatment for his mental illness. After meeting with John in person, both doctors opined that he cannot care for himself because his judgment and capacity to recognize reality are substantially impaired. Accordingly, a reasonable inference from John being outside in temperatures twenty degrees below zero without proper clothing is that he lacks the capacity to recognize situations in which he faces a substantial probability of, at a minimum, serious physical injury or debilitation. We therefore agree with the circuit court that there is clear and convincing evidence that John is dangerous under WIS. STAT. § 51.20(1)(a)2.d.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.