COURT OF APPEALS
DECISION
DATED AND FILED

April 3, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1596**

Cir. Ct. No. **2023JC20**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

IN THE INTEREST OF G.L.W., A PERSON UNDER THE AGE OF 18:

MONROE COUNTY,

PETITIONER-RESPONDENT,

V.

G. L. B.,

RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Monroe County: TODD L. ZIEGLER, Judge. *Affirmed*.

¶1     KLOPPENBURG, P.J.[1]  G.L.B. (the father) appeals a dispositional order finding his son (the child) a child in need of protection or services (CHIPS) and placing the child in out-of-home care.  The father argues that the circuit court erred in three respects.  First, the father argues that the court erroneously denied the father's pretrial petition to transfer jurisdiction of the child's CHIPS case to the Ho-Chunk Nation's tribal court.  Second, the father argues that, at the trial on the CHIPS petition, the court erroneously admitted evidence regarding a Child and Caregiving Risk Assessment and updated assessment.  Third, the father argues that, in the dispositional order, the court erred in granting medical decision-making authority to the Monroe County Department of Human Services (the Department).  I reject the father's arguments and, therefore, affirm.

## BACKGROUND

¶2     The child, whose mother is an enrolled member of the Ho-Chunk Nation, is also an enrolled member of the Ho-Chunk Nation.  In July 2023, the Department filed a CHIPS petition under WIS. STAT. ch. 48 and the Indian Child Welfare Act regarding the child, who was then 12 years old, along with a

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

Temporary Physical Custody Request.[2] The petition and request were based on concerns that the parents are unable to provide for the child's medical needs, so as to seriously endanger his physical health. The child is diagnosed with Autism Spectrum Disorder, failure to thrive, feeding problem in a child, global developmental delays, Lennox-Gastaut Syndrome (a severe type of epilepsy), and myoclonic seizure disorder. The child requires intensive care and the administration of multiple medications to treat the child's complicated, difficult, and life-threatening illnesses and to prevent severe outcomes.

¶3 After the Department filed the CHIPS petition, the Ho-Chunk Nation intervened in the case. Six attorneys appeared throughout the circuit court proceedings: corporation counsel for the Department, counsel for the father, counsel for the mother, counsel for the child, a guardian ad litem (GAL), and counsel for the Ho-Chunk Nation.

¶4 The circuit court granted the request for temporary physical custody, and the child was placed in the physical custody of the Gundersen Health System, where he had been receiving medical care. The child was subsequently placed

---

[2] The Indian Child Welfare Act governs state court child custody proceedings involving Indian children. *Kewaunee Cnty. Dep't of Hum. Servs. v. R. I.*, 2018 WI App 7, ¶12, 379 Wis. 2d 750, 907 N.W.2d 105 (2017). The purpose of the Act is to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." 25 U.S.C. § 1902. Wisconsin codified these minimum federal standards in WIS. STAT. § 48.028. *See generally* WIS. STAT. §§ 48.028, 48.31(5), 48.355(2)(b)6v.

with his maternal aunt, in accordance with the Ho-Chunk Nation's placement preference ranking.

¶5 On August 7, 2023, the child's mother and father jointly petitioned for the case to be transferred to the Tribal Court of the Ho-Chunk Nation, pursuant to WIS. STAT. § 48.028(3)(c). The child, by counsel, filed an objection to the transfer petition and stated that counsel for the Ho-Chunk Nation and the GAL concurred with the objection. After briefing and a hearing, the circuit court denied the transfer petition.

¶6 A five-day jury trial took place on the CHIPS petition. During the trial, the jury heard testimony from multiple Department employees, several of the child's doctors and other healthcare providers, the child's teacher, a social worker who prepared Child and Caregiving Risk Assessments and an updated assessment for the child's mother and father, a case manager in the Indian Child Welfare Program with the Ho-Chunk Nation who testified as a qualified expert witness as required by WIS. STAT. § 48.028(4)(d), and the child's mother and father. Consistent with the jury's verdicts, the circuit court found the child in need of protection or services based on each parent's inability to provide for the child's medical needs such that continued custody with each of the parents is likely to result in serious physical damage to the child.

¶7 The circuit court held a dispositional hearing on January 17, 2024. At the hearing, the court adopted the Department's recommendations, ordering

that the child continue to be placed with his aunt and granting authority to make all medical decisions for the child to the Department.

¶8 The father appeals.[3]

## DISCUSSION

¶9 I first summarize the statutory framework regarding CHIPS proceedings and then address the father's arguments in turn.

¶10 CHIPS proceedings under WIS. STAT. § 48.13 must be initiated by a petition with allegations that are based on "reliable and credible information" and provide "reasonable notice of the conduct or circumstances to be considered by the court." WIS. STAT. § 48.255(1)(e). Once the petition is filed, a fact-finding hearing is required to determine whether those allegations are supported by "clear and convincing evidence." WIS. STAT. § 48.31(1). The circuit court is the fact-finder at this hearing unless, as here, a jury trial is requested. Sec. 48.31(2). If the jury finds that the allegations in the petition are proven by clear and convincing evidence, then the court must determine whether, as a matter of law, the evidence is legally sufficient. *State v. Aimee M.*, 194 Wis. 2d 282, 299, 533 N.W.2d 812

---

[3] The mother has filed a separate appeal, and the opinion in that appeal is being issued concurrently with this opinion. *See Monroe County v. T.B.*, No. 2024AP1845, unpublished slip op. (WI App Apr. 3, 2025). Separate opinions are issued in these appeals because of differences in the parties' arguments. However, parts of the analysis in this opinion track the analysis in that opinion when the parties' arguments overlap.

(1995). If so, the court concludes as a matter of law that the child is in need of protection or services. *Id.*; § 48.31(2) and (4).

¶11 The circuit court may determine that a child is "in need of protection or services" if the jury finds that "one or more" of the jurisdictional bases set forth under WIS. STAT. § 48.13 are established. *See Aimee M.*, 194 Wis. 2d at 299; *see also* § 48.13 (intro.) ("[T]he court has exclusive original jurisdiction ... if one of the following applies[.]"). The jurisdictional basis at issue here is set forth in § 48.13(10): "The child's parent … is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child." The court's determination as to whether a child is in need of protection or services "should be made based on facts as they existed at the time the petition was filed." *State v. Gregory L.S.*, 2002 WI App 101, ¶29, 253 Wis. 2d 563, 643 N.W.2d 890.

¶12 When, as here, the child "is an Indian child," the jury shall also determine whether continued custody of the child by the child's parent "is likely to result in serious … physical damage to the Indian child under [WIS. STAT. §] 48.028(4)(d)1. and whether active efforts under [§] 48.028(4)(d)2. have been made to prevent the breakup of the Indian child's family and whether those efforts have proved unsuccessful." WIS. STAT. § 48.31(5). Section 48.028(4)(d)1. requires that the jury find "by clear and convincing evidence, including the testimony of one or more qualified expert witnesses" as defined in § 48.028(4)(f),

that "continued custody of the Indian child by the parent … is likely to result in serious … physical damage to the child." Section 48.028(4)(d)2. requires that the jury find "by clear and convincing evidence that active efforts," which are defined in § 48.028(4)(g)1., "have been made to provide remedial services and rehabilitation programs designed to prevent the breakup of the Indian child's family and that those efforts have proved unsuccessful."

¶13    Once the circuit court determines that a child is in need of protection or services, the court must enter a dispositional order setting forth the care and treatment plan for the child. WIS. STAT. § 48.345. Under WIS. STAT. § 48.355(2)(b)6v., a dispositional order removing an Indian child from the child's home must be "supported by clear and convincing evidence, including the testimony of one or more qualified expert witnesses, that continued custody of the Indian child by the parent … is likely to result in serious … physical damage to the child under [WIS. STAT. §] 48.028(4)(d)1. and a finding that active efforts under [§] 48.028(4)(d)2. have been made to prevent the breakup of the Indian child's family and that those efforts have proved unsuccessful." The court's dispositional order should be "consistent with the factual grounds proven at the trial." *Aimee M.*, 194 Wis. 2d at 299; *see also* § 48.355(1) ("In any order under [§] 48.345 ... the judge shall decide on a placement and treatment finding based on evidence submitted to the judge."). The court may consider circumstances

subsequent to the petition's filing at the dispositional hearing. *Gregory L.S.*, 253 Wis. 2d 563, ¶4.

### I. Denial of petition to transfer case to tribal court

¶14 The father argues that the circuit court erroneously denied the father's pretrial petition to transfer jurisdiction of the child's CHIPS case to the Ho-Chunk Nation's tribal court. Specifically, the father argues that the court applied an incorrect legal standard when it found good cause based on its consideration of the resources available to the tribal social services department and tribal court. This argument fails because it rests on an inaccurate characterization of the court's decision. The record establishes that the court determined that there is good cause to deny the transfer petition based on the child's objection to the transfer, consistent with WIS. STAT. § 48.028(3)(c).

### A. *Applicable statutory language and standard of review*

¶15 Under WIS. STAT. § 48.028(3)(c), a parent of an Indian child who does not reside within the child's tribe's reservation may petition the circuit court to transfer the CHIPS proceeding to the jurisdiction of the tribe. When such a petition is filed, the circuit court "shall … transfer the proceeding to the jurisdiction of the tribe unless any of the following applies:"

> 1. A parent of the Indian child objects to the transfer.
>
> 2. The Indian child's tribe does not have a tribal court, or the tribal court of the Indian child's tribe declines jurisdiction.

3. The court determines that good cause exists to deny the transfer. In determining whether good cause exists to deny the transfer, the court may not consider any perceived inadequacy of the tribal social services department or the tribal court of the Indian child's tribe. The court may determine that good cause exists to deny the transfer only if the person opposing the transfer shows by clear and convincing evidence that any of the following applies:

> a. The Indian child is 12 years of age or over and objects to the transfer.

> b. The evidence or testimony necessary to decide the case cannot be presented in tribal court without undue hardship to the parties or the witnesses and that the tribal court is unable to mitigate the hardship by making arrangements to receive the evidence or testimony by use of telephone or live audiovisual means, by hearing the evidence or testimony at a location that is convenient to the parties and witnesses, or by use of other means permissible under the tribal court's rules of evidence.

> c. The Indian child's tribe received notice of the proceeding under sub. (4) (a), the tribe has not indicated to the court in writing that the tribe is monitoring the proceeding and may request a transfer at a later date, the petition for transfer is filed by the tribe, and the petition for transfer is filed more than 6 months after the tribe received notice of the proceeding or, if the proceeding is a termination of parental rights proceeding, more than 3 months after the tribe received notice of the proceeding.

Sec. 48.028(3)(c).

¶16    This appeal involves the interpretation and application of WIS. STAT. § 48.028(3)(c). "'The interpretation and application of statutes present questions of law that we review independently.'" *Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶9, 400 Wis. 2d 417, 970 N.W.2d 1 (quoted source omitted). Statutory

interpretation "'begins with the language of the statute.' If the meaning of the language is plain, our inquiry ordinarily ends." *Id.*, ¶11 (quoted sources omitted). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. When deciding whether language is plain, courts must read the words in context and with a view to the place of those words in the overall statutory scheme. *Brey*, 400 Wis. 2d 417, ¶11. "Properly applied, the plain-meaning approach is not 'literalistic'; rather, the ascertainment of meaning involves a 'process of analysis' focused on deriving the fair meaning of the text itself." *Id.* (citing *Kalal*, 271 Wis. 2d 633, ¶¶46, 52). "'If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning.'" *Kalal*, 271 Wis. 2d 633, ¶46 (quoted source omitted).

¶17 This appeal also involves review of the circuit court's discretionary decision that there is good cause warranting denial of the father's transfer petition. This court will sustain a circuit court's discretionary decision when it examines the relevant facts, applies a proper standard of law, and, using a rational process, reaches a conclusion that a reasonable judge could reach. *Loy v. Bunderson*, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982).

### B. Additional background

¶18    At the hearing on the parents' petition to transfer, the circuit court noted that the parties did not offer additional evidence on the issue of good cause and proceeded to hear the parties' arguments on the petition. The Department took no position on the petition. The father's counsel explained that the parents are more familiar with the tribal court "process and … players" from a prior out-of-home placement of the child through the tribal court. Counsel for the Ho-Chunk Nation stated that the Tribe opposes transfer for the reasons stated by the child's counsel (summarized below). In addition, the Tribe's counsel noted that, while not included in the good cause determination, the child has significant needs that will be difficult to meet given the "shortages and resources at the [T]ribe."

¶19    The child's counsel stated that the child's objection is one step in the good cause determination, and that the child's medical record filed in the case "enhances" the weight of that objection. The child's counsel noted that since the child was returned to the home following the prior out-of-home placement, the child's condition had deteriorated as a result of the parents' failure to properly administer medications and to recognize the seriousness of the child's medical conditions. The child's counsel asserted that the child's return to the parents' home is most likely to occur if the parents work with and learn from the medical professionals already long involved in the child's care through the Department,

and that the Department has the resources to make the child's return home happen. The GAL agreed with the child's counsel's remarks.

¶20    The circuit court noted that it must determine whether good cause exists and that the use of the word "may" in the statute means that the court has discretion whether to deny transfer if good cause does exist. The court noted that the clear and convincing evidence standard for proving good cause is not an issue because the child is at least 12 years old and has objected through counsel. The court then considered that the child's objection must be taken seriously, and that the GAL's support of the child's objection weighs in favor of denying transfer, while the parents' request for transfer "weighs somewhat in favor" of granting transfer. The court concluded both that good cause exists, based on the child's objection, and that denial of transfer is warranted. The court reiterated that, "I am determining that the good cause exists and that the good cause exists such that I will deny transfer to tribal court at this time."

## C.  Analysis

¶21    Relevant here, the statute provides that a circuit court "shall" grant a petition for transfer unless the court determines "that good cause exists to deny the transfer." WIS. STAT. § 48.028(3)(c)3. The statute circumscribes the court's determination of good cause in two respects:  (1) good cause excludes consideration of the perceived capacities of or resources available to the tribal social services department or the tribal court; and (2) good cause includes

12

consideration only of the three circumstances described in the statute. Sec. 48.028(3)(c)3. One of those circumstances is that the child "is 12 years of age or over and objects to the transfer." Sec. 48.028(3)(c)3.a. If any of those three circumstances exist, then the court "may" determine that good cause exists to deny the transfer. Sec. 48.028(3)(c)3.

¶22 We agree with the circuit court that the use of "may" in the final sentence of WIS. STAT. § 48.028(3)(c)3. connotes an exercise of discretion *after* the court has determined the existence of one of the three circumstances within the statute's mandatory dictates. In other words, once the court determines that one of the three circumstances as delimited by the statute exists, the court may in its discretion determine that there is good cause warranting denial of the transfer.

¶23 Here, consistent with this plain language interpretation of the statute, the circuit court first determined that good cause may exist based on the objection to transfer by the 12-year-old child. As summarized above, the court then determined that the child's objection and the GAL's support of the child's objection weigh more heavily in favor of denying transfer than the parents' request for transfer weighs in favor of granting transfer. Having engaged in that weighing, the court concluded that good cause exists to deny the transfer.

¶24 The father does not engage in a plain language interpretation of the statute. Rather, the father argues that the circuit court erred in determining the existence of good cause based on its "perception" that the tribal social services

department and the tribal court lack sufficient resources. As I explain, the record refutes this argument.

¶25 The court did note at the start of its oral ruling that it was not certain whether, once it determined that one of the circumstances that may constitute good cause exists, the statute's use of the word "may" allowed it to consider "that there might not be as many resources through tribal social services." But the court said that that consideration did not affect its decision, and the record as summarized above establishes that the court did not consider that factor in making its decision.

¶26 The circuit court did acknowledge that potential delays in the tribal court were concerning, given the extensive network of care providers "already working on" the child's many different medical issues in what the court deemed "a priority case." But the court did so only after it had stated its decision and in response to remarks that the father made after the court stated its decision. And the court did so to reinforce the crux of its response to the father's remarks, that it is important for the parents to move forward within the network already in place, to work towards the child's return to the parents' home. Thus, the court did not, as the father argues, consider the perceived inadequacy of tribal resources in determining that good cause exists to deny transfer.

¶27 The father also suggests that the circuit court erred in relying on the child's objection, by counsel, because the child was only 14 days past his twelfth birthday and because of the child's disabilities. However, the father does not

develop an argument with supporting cites to the record showing that counsel misrepresented the child's position or that the child was unable to communicate his objection to counsel. Nor does the father develop an argument supported by legal authority that either fact is, as a matter of law, a basis for calling the child's objection into question. Accordingly, I do not consider this suggested argument further. *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("Arguments unsupported by legal authority will not be considered, and we will not abandon our neutrality to develop arguments." (citations omitted)).

¶28 The father further argues that the circuit court erred "by denying transfer without an appropriate finding of good cause" when the court did not first contact the tribal court to ascertain whether it would accept jurisdiction. The father cites 25 U.S.C. § 1911(b) of the federal Indian Child Welfare Act, which, like WIS. STAT. § 48.028(3)(c), provides that the state court may not grant transfer if the tribal court declines transfer. 25 U.S.C. § 1911(b); WIS. STAT. § 48.028(3)(c)2. More specifically, the federal statute provides that, in the absence of good cause to deny transfer, a circuit court shall grant transfer, "subject to declination by the tribal court." 25 U.S.C. § 1911(b). Similarly, § 48.028(3)(c)2. and 3. provide that a circuit court shall grant transfer "unless … the tribal court declines jurisdiction" or "[t]he court determines that good cause exists to deny the transfer." Thus, under both federal and state law, the state

court's failure to ascertain whether the tribal court declines jurisdiction may invalidate the state court's denial of transfer only in the absence of good cause to deny transfer. Because I have rejected the father's argument that the circuit court here denied transfer without an appropriate finding of good cause, the father's argument fails.

¶29 The father also cites language in ***Brown County v. Marcella G.***, 2001 WI App 194, ¶14, 247 Wis. 2d 158, 634 N.W.2d 140, that "once the circuit court received Marcella's request for transfer, it should have notified the tribal court of the proposed transfer." However, that case is easily distinguished. In that case, Brown County petitioned to terminate Marcella's parental rights to her four children, three of whom were enrolled in the Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota (referred to in the opinion as "the Tribe"). ***Id.***, ¶¶1, 3. The Tribe filed a motion to transfer jurisdiction with respect to the three enrolled children to the tribal court. ***Id.***, ¶3. The Tribe supported its motion with a tribal court order accepting jurisdiction. ***Id.*** The circuit court held a hearing on the motion at which Brown County presented a memorandum of understanding in which the Tribe withdrew its motion to transfer jurisdiction. ***Id.***, ¶4. Marcella objected to the memorandum and orally moved the court to transfer jurisdiction to the tribal court. ***Id.***, ¶5.

¶30 The circuit court denied Marcella's motion to transfer based on what this court determined was the erroneous determination that Marcella lacked

standing to request transfer. *Id.*, ¶¶5, 7. This court also determined that the circuit court erroneously accepted the Tribe's withdrawal of its motion to transfer, without having been presented with "any documentation suggesting that the tribal court had withdrawn its order accepting jurisdiction." *Id.*, ¶¶4, 14. This court noted that the circuit court "should have contacted the tribal court to ascertain its intentions" given the existing tribal court order accepting jurisdiction. *Id.*, ¶14 n.10.

¶31 The facts in *Marcella G.* are distinguishable in two important respects. First, unlike in *Marcella G.*, the circuit court here properly denied the father's transfer petition based on one of the statutory prerequisites for denial, namely, the existence of good cause. Thus, there was no transfer of jurisdiction for the tribal court to decline. Second, unlike in *Marcella G.*, no tribal court order accepting jurisdiction was presented to the circuit court here. Therefore, no follow-up with the tribal court was required once the circuit court denied the transfer petition based on the existence of good cause, under the above-stated plain language analysis of WIS. STAT. § 48.028(3)(c)3. and the above-quoted language of 25 U.S.C. § 1911(b). To repeat, the father's argument is ultimately premised on the absence of an appropriate finding of good cause for denying transfer. Because I have rejected that premise, the father's argument that the court erred by failing to notify the tribal court of his transfer petition fails.

**II. Admission of evidence regarding Child and Caregiving Risk Assessments**

¶32 The father argues that, during the jury trial on the CHIPS petition, the circuit court erroneously admitted a Child and Caregiving Risk Assessment and an updated assessment (generally, the assessments) and testimony regarding the assessments.

¶33 A circuit court's decision to admit or exclude evidence is reviewed for an erroneous exercise of discretion. *Allsop Venture Partners III v. Murphy Desmond SC*, 2023 WI 43, ¶23, 407 Wis. 2d 387, 991 N.W.2d 320. "As long as the circuit court 'examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion,' we will not disturb its ruling." *Id.* (quoted source omitted).

*A. Additional background*

¶34 Social worker Ted Stein prepared an assessment of the father in March 2022 and an updated assessment of the father in early December 2023. Stein met with the father only in connection with the initial assessment, which related to a prior proceeding involving the child's brother. In preparing the updated assessment, Stein reviewed the initial assessment along with the CHIPS petition and notes by a Department social worker.

¶35 During pretrial hearings, the father objected to the admission of the assessments and testimony regarding the assessments for lack of relevance because the initial assessment was produced in March 2022 and pertained to the

brother and the updated assessment was not based on an evaluation of the parents with the child. The circuit court overruled the objection, explaining that the assessments and testimony concern "parental functioning abilities," which are relevant as to whether the parents are unable for reasons other than poverty to provide the necessary care, food, clothing, medical or dental care, or shelter so as to seriously endanger the physical health of the child. However, the court cautioned counsel that there would be no reference to the brother or the earlier proceeding pertaining to the brother.

¶36 At trial, Stein testified on direct examination as to the nature and results of the various tests that he administered in assessing each parent's caregiving abilities generally, and he explained how the results of some of the tests also relate to each parent's ability to care for a child with complex medical needs. He testified that most of the tests measure "static factors" that do not change over time. After Stein testified about all of the tests he administered, the father renewed his standing objection to Stein's testimony on the basis that Stein had not evaluated the parents since 2022. In response to the objection, Stein acknowledged that he prepared an initial caregiver assessment, some time passed, and he reviewed the assessment and other documents in preparing the updated assessment. He testified that "the key areas" assessed in which the father is

> challenged and [are] really unchangeable are intellectual functioning; … adaptive and social functioning, and personality and emotional functioning; parent knowledge, et cetera.

Interactions and potential for change are all really dependent then on other static factors … and the developmental needs of the child as they grow. So [the father is] challenged in almost all areas as I organized the report based on child and caregiving risk.

¶37 Stein further testified that the information provided by many of the tests he administered applies regardless of the needs of the particular child at issue. He acknowledged that, based on the static factors he assessed, the father has "identified … struggles" as a parent that apply independently of whether the child has exceptional needs.

¶38 On redirect examination, Stein testified that the mother has a passive personality and the father does not have a passive personality. Stein was then asked, "[I]f you had to pick out some words to describe [the father's] personality, what would th[ey] be?" The father objected on the basis that the question was "asked and answered earlier in [Stein's] testimony." The circuit court overruled the objection, and Stein testified, "I used words in my report that describe him as," and proceeded over two-and-one-half pages of transcript to pull descriptive words and phrases from one page of his initial assessment of the father (the "descriptive words answer").

## B. Relevance

¶39 The father argues that the circuit court erred in admitting the assessments and testimony regarding the assessments because they were not

20

relevant or, if relevant, because their probative value was substantially outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury.

¶40 Relevant evidence, meaning "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," is generally admissible. WIS. STAT. §§ 904.01, 904.02. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." WIS. STAT. § 904.03.

¶41 Here, the jury was asked to make the following factual findings: that the father is "unable for reasons other than poverty to provide necessary care, food, or medical care for [the child] so as to seriously endanger [the child's] physical health"; that "continued custody of [the child] by [the father is] likely to result in serious physical damage to [the child]"; and that "active efforts [were] made to provide remedial services and rehabilitative programs designed to prevent" the out-of-home placement of the child and the efforts were "unsuccessful."

¶42 I conclude that the circuit court properly admitted the assessments and testimony regarding the assessments as relevant to the questions that the jury would need to decide—including whether the father is able to provide the

21

necessary care so as not to endanger the child's physical health and whether efforts to help the father do so were not successful—and that the father fails to show that this highly probative evidence was substantially outweighed by the risk of unfair prejudice, confusion of the issues, or misleading the jury.

¶43 The evidence at trial was limited to events occurring up to the date the CHIPS petition was filed, July 14, 2023. Stein administered the tests reported in his initial assessment in March 2022, about 16 months before the petition was filed, and updated the assessment based on his review of the petition and supporting documents. Stein testified to how the tests relate to parental functioning and caregiving and that most of the results he reported are both static and independent of the needs of the particular child at issue. In his updated assessment, Stein explained that the information he reviewed since he prepared the initial assessment confirms the results that he reported in the initial assessment and that the parenting challenges that he initially reported remain present and unchanged. He concluded that the father "made no gains" since the initial assessment, and that the initial assessment "is very much applicable to the current situation with [the child]," whose "medical needs are much more complex."

¶44 The circuit court properly exercised its discretion in determining that the assessments and testimony were relevant to the father's abilities and functioning as a caregiver. That the initial assessment predated the filing of the petition by 16 months and involved the child's brother did not reduce its relevance

on these issues given the unrefuted testimony that: most of the results reported in the initial assessment relate to static factors that are unchangeable and apply regardless of the needs of a particular child; the father had not made any gains on any of the factors; and the results remain applicable both to the father as a parent generally and to the father as a parent of the child at issue.

¶45 The father's arguments to the contrary are unavailing. The father argues that the circuit court erred in not considering that a parent's functioning levels and abilities are not static and depend on the circumstances, but he does not identify evidence that most of the functioning levels and abilities assessed by Stein are other than what Stein testified—static and unchangeable. The father argues that a person's characteristics and traits can change over a two-year period, but he points to no evidence that the father's characteristics and traits tested in the assessments did so over the 16-month period here. The father argues that the circumstances preceding the petition and pertaining to the child were significantly different from those when the initial assessment took place, but he points to no evidence that any of the test results in the initial assessment are variable depending on the circumstances, rather than fixed regardless of circumstances. That Stein did not meet again with the father since the initial assessment did not render the assessments and testimony not relevant, given the testimony summarized above; rather, it went to the weight of that evidence.

¶46     The father argues that the jury was misled because it did not know that the initial assessment occurred 16 months before the petition was filed and involved a different child, and that the jury would have questioned Stein's credibility had the jury known those facts. But the father does not point to evidence that that timing mattered; as summarized above, the evidence that the timing did not matter was unrefuted. The father also argues that the jury would have questioned Stein's credibility had the jury known that Stein had not seen the father with the child, but Stein did testify that he did not observe the father with the child either as part of his initial assessment or his updated assessment.

¶47     In sum, the father fails to show that the circuit court erroneously exercised its discretion in admitting the assessments and testimony as relevant evidence, or that the high probative value of the evidence was substantially outweighed by the risk of unfair prejudice, confusion of the issues, or misleading the jury.

### C. Improper character and other acts evidence

¶48     The father's arguments challenging the circuit court's admission of Stein's testimony as improper character and other acts evidence are limited to the descriptive words answer, in which Stein pulled descriptive words and phrases from his initial assessment of the father, without interruption, over two-and-one-

half transcript pages. The father argues that the court should have analyzed and excluded this "monologue" as improper character and other acts evidence.[4]

¶49 Under WIS. STAT. § 904.04(1), "[e]vidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion." Under § 904.04(2), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith."

¶50 The other acts statute is directed at shielding fact-finders from unnecessary exposure to character and propensity evidence in the context of determining whether a party committed an alleged act. *State v. Benoit*, 229 Wis. 2d 630, 639, 600 N.W.2d 193 (Ct. App. 1999). Exposure in this context threatens the bedrock principle that persons should be found liable based on evidence of the particular alleged act, not based on bad character or propensity to commit the type of act alleged. That concern does not apply here. In determining whether a parent is able to provide the necessary care so as not to endanger a child's physical health and whether efforts to help the parent do so have not been successful, a fact-finder must necessarily consider the parent's relevant character

---

[4] The father also notes in passing that much of Stein's assessments and testimony was based on inadmissible hearsay, but does not develop an argument supported by references to the record or legal authority on the hearsay topic. Accordingly, I do not consider this topic further.

traits and patterns of behavior pertaining to the parent's ability to provide the necessary care for the child and to respond to efforts to help the parent do so, and the likelihood that those traits and behavioral patterns will continue such that continued placement in the home will endanger the child's physical safety. *See* WIS. STAT. §§ 48.13(10), 48.31(5), 48.028(4)(d)1. and 2. (setting forth the facts that must be proven to remove an Indian child from the child's home under the circumstances in this case).

¶51 Said another way, Stein's descriptive words answer was not introduced to prove that the father committed certain acts, but that he has certain traits and levels of functioning that render him unable, for reasons other than poverty, to provide for the necessary care of the child so as not to endanger the child's physical health, and that efforts to enable him to do so have not yet proven successful, as the jury was required to find under the statutes set forth above. The father's characterization of Stein's descriptive words answer as inadmissible other acts evidence would nullify these statutory requirements. The circuit court did not erroneously exercise its discretion in overruling the father's objection to this testimony by failing to analyze and exclude it as other acts evidence.

¶52 Further, even accepting the father's characterization of Stein's descriptive words answer as other acts evidence, other acts evidence is admissible "when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." WIS.

STAT. § 904.04(2)(a). Here, it could be said that the evidence was offered for "other purposes" including proof of the father's "opportunity" to provide the necessary care for the child and the "absence" of any "mistake or accident" preventing him from doing so. *See* § 904.04(2)(a). Alternatively, any error in admitting Stein's descriptive words answer was harmless, because the traits and behaviors that he described were also described in greater specificity by him in his earlier testimony about the tests that he administered and by the medical care providers and social workers who interacted with the father. On this record, it cannot be concluded that had Stein's descriptive words answer been excluded, there would have been a reasonable possibility of a different outcome. *See* WIS. STAT. § 805.18(2) (the improper admission of evidence is harmless error if the error did not affect the party's substantial rights); ***Evelyn C. R. v. Tykila S.***, 2001 WI 110, ¶28, 246 Wis. 2d 1, 629 N.W.2d 768 ("For an error to affect the substantial rights of a party, there must be a reasonable possibility that the error contributed to the outcome of the action," sufficient to undermine confidence in the outcome.).

¶53 In sum, I conclude that the circuit court properly exercised its discretion in admitting the assessments and testimony, including Stein's descriptive words answer, regarding the assessments.

### III. Grant of medical decision-making authority to the Department

¶54     The father challenges the term in the dispositional order that grants medical decision-making authority to the Department.[5]

¶55     This court reviews a circuit court's dispositional order for an erroneous exercise of discretion.  *State v. Richard J. D.*, 2006 WI App 242, ¶5, 297 Wis. 2d 20, 724 N.W.2d 665.  "The circuit court properly exercises its discretion when it examines the relevant facts, applies the proper legal standard, and uses a rational process to reach a reasonable conclusion."  *Id.*

¶56     At the dispositional hearing, the circuit court specifically addressed "the medical decision[-]making issue."  The court stated that at trial

> the primary concern … was the medical care for [the child], missing appointments, addressing medical advice, et cetera.
>
> I'm satisfied that … it's appropriate to grant the County's request, in that the human services director would be designated to make medical decisions, or her designee, and that the MyChart system would provide access to the parents, except the parents would not be able to change or cancel or modify any appointments.

The court stressed that the parents "would be involved in making all significant medical decisions" and

> should be consulted.  This is something that we can revisit throughout the case, and [the] parents can show their ability

---

[5] The dispositional order transfers decision-making authority to the Director of the Department.  For ease of reading, this opinion uses the shorthand reference "Department" for the "Director of the Department."

28

to make those decisions in [the child's] best interests by making sure they are at appointments, not missing appointments, … being engaged in the medical appointments, and giving appropriate input regarding medical decisions.

¶57 The circuit court subsequently issued, as part of its dispositional order, an order for "medical or other treatment authorization" that provides as follows:

The Director of the Monroe County Department of Human Services … or the Director's designee is hereby granted legal authority, by Order of the Monroe County Circuit Court, to sign all medical consents or authorizations for [the child] to receive medical care, surgical procedures, mental health treatment, or care, dental treatment or care, or medical testing.

Prior to the Director of the Monroe County Department of Human Services authorizing any action, both parents … need to be made aware of the request and they need to be provided details regarding the request or procedure. Their position, along with any concerns, needs to be provided to Director of Human Services for consideration.

The parents … have the right to access medical information and meet with medical staff. The Gundersen My[C]hart system can still be accessed by the parents if it can be set up to allow them viewing access only. The parents are not allowed to reschedule, modify, or cancel any appointments or procedures for [the child]. The parents shall not interfere with medication management.

¶58 The father argues that the circuit court misapplied the law. Specifically, the father argues that the law provides that a court may grant medical decision-making authority to a county department of health services only if the court transfers legal custody to the department after making the factual findings required under WIS. STAT. § 48.345(4). The father argues that, under § 48.345, the

court could not lawfully grant medical decision-making authority to the Department here because the court neither transferred legal custody to the Department nor made the statutory findings to support such a transfer.

¶59 A plain language analysis of WIS. STAT. § 48.345 refutes the father's argument. That statute provides in relevant part:

> If the judge finds that the child is in need of protection or services …, the judge shall enter an order deciding one or more of the dispositions of the case as provided in this section under a care and treatment plan [with exceptions not relevant here]. The dispositions under this section are as follows:
>
> …
>
> **(3)** Subject to [exceptions not relevant here], designate one of the following as the placement for the child:
>
> > (a) The home of a parent, other relative, or like-kin of the child….
>
> …
>
> **(4)** If it is shown that the rehabilitation or the treatment and care of the child cannot be accomplished by means of voluntary consent of the parent or guardian, transfer legal custody to any of the following:
>
> …
>
> > (b) The county department….

¶60 The statute by its terms authorizes the circuit court to "decid[e]" one or more of the listed dispositions under a care and treatment plan. Here, the court "decided" to order the disposition of placement with the child's maternal aunt, accompanied by a "medical or other treatment authorization" that grants medical decision-making authority to the Department. Importantly, the medical treatment

authorization also requires that the Department consult with the parents before making any medical decisions and preserves the parents' access to the child's medical records. In including these terms in the dispositional order, the court implicitly preserves and encourages the parents' participation in the child's medical care while ensuring that medical decisions will be timely made to protect the child's physical safety. As the court explained at the dispositional hearing, one of the goals of engaging the parents in the child's medical appointments and care is "to ensure [the parents'] complete understanding of [the child's] needs." The court further explained how the parents can regain medical decision-making authority by demonstrating that understanding through engaging in the child's appointments and providing appropriate input regarding medical decisions.

¶61     The father accurately states that the language in WIS. STAT. § 48.345 providing that "the judge shall enter an order deciding one or more of the dispositions of the case as provided in this section under a care and treatment plan," limits the court to the dispositions listed in § 48.345(1)-(15). Transferring legal custody from the parents under § 48.345(4) is one of the listed dispositions. Placing the child in the home of a relative under § 48.345(3) is another listed disposition. However, there is no language in the statute precluding the court, in a dispositional order for out-of-home placement without a transfer of legal custody, from granting the county department decision-making authority over the medical care and treatment of the child as part of the out-of-home placement disposition, in

the exercise of the circuit court's discretion. In other words, there is no language in any part of § 48.345 that requires the court to transfer legal custody to the county department in order to grant medical decision-making authority to the county department as part of another disposition. Rather, the language of § 48.345 makes clear that the granting of medical decision-making authority to the county department is, alone, not a disposition. Instead, it is part of the dispositional order setting forth the care and treatment plan for the child.

¶62 Read in context of the dispositional order of which the granting of medical decision-making authority to the county department here is a part, the granting of that authority addresses the medical care required by the child's complex and potentially life-threatening illnesses and sets forth a process that both ensures timely provision of that care and enables the parents to engage in the child's required medical care so as to regain medical decision-making authority. That approach is supported by the substantial evidence in the record of the child's extraordinary medical needs and the parents' failure to understand or meet those needs.

¶63 The record is replete with evidence, including testimony by the medical care providers and social workers who interacted with the family, that the father is unable to make medical decisions for the child so as to protect the child's physical safety. The findings in the dispositional order reflect that evidence. These findings include the following. The parents "lack the understanding of [the

child's] medical needs," "have demonstrated an inability to attend medical appointments as required," did not "follow through on medical treatments and have not administered crucial medications to [the child] as directed," and failed "to follow medical directions for [the child's] needs," all of which "could result in further decline and potentially death due to uncontrolled seizures." Also, the Department's efforts to collaborate with the parents were "not successful." The Statement of Active Efforts required by the Indian Child Welfare Act, which is attached to the dispositional order, references the danger to the child resulting from the parents not "cooperating/collaborating with medical providers, following through on attending appointments, getting medications filled, or recognizing [the child's] seizures and respond[ing] appropriate[ly] to them" despite the many services provided by the Department. The Statement also notes that there are further barriers to ensuring the child's physical safety from the father's "preventing or not allowing treatment, services, or medications to be filled."

¶64 That the circuit court did not decide the disposition to transfer legal custody from the parents is consistent with both the disposition that the court did decide—placement with the child's aunt—and the permanency plan adopted by the court, stating that one of the concurrent goals is "return home to the parents." Pertinent to that goal, leaving legal custody with the parents is consistent with the court's explanation of how the parents can regain medical decision-making authority through their working with the Department on the child's medical care

within the parameters of the medical or other treatment authorization while the child is placed in the home of his aunt. The granting of medical decision-making authority to the Department while that process takes place is supported by the evidence showing that each parent is currently unable to exercise that authority so as to protect the child's physical safety.

¶65 In sum, the father fails to show that the circuit court erroneously exercised its discretion in granting medical decision-making authority to the Department as part of its dispositional order for out-of-home placement. As explained above, the court "examine[d] the relevant facts, applie[d] the proper legal standard, and use[d] a rational process to reach a reasonable conclusion." *See Richard J. D.*, 297 Wis. 2d 20, ¶5.

## CONCLUSION

¶66 This court affirms the circuit court's dispositional order for the reasons stated.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.